[No. S004713. Crim No. 25438. May 17, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RYAN MICHAEL MARSHALL, Defendant and Appellant.

[No. S009001. May 17, 1990.]

In re RYAN MICHAEL MARSHALL on Habeas Corpus.

916

**COUNSEL**

Michael R. Snedeker, under appointment by the Supreme Court, and Lisa Short for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Ward C. Campbell and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant Ryan Michael Marshall was charged under the 1978 death penalty law (Pen. Code, § 190.1 et seq.) with murdering Silva Teague (*id.*, § 187), robbing her (*id.*, § 211) and burglarizing her residence (*id.*, § 459). As to the murder, the special circumstances of felony-murder-robbery (*id.*, § 190.2, subd. (a)(17)(i)) and felony-murder-burglary (*id.*, § 190.2, subd. (a)(17)(vii)) were alleged. As to each offense, the use of a firearm was also alleged. (*Id.*, § 12022.5.) Defendant pleaded not guilty and denied the allegations. Trial was by jury. The jury found defendant guilty as charged and found the allegations to be true. It subsequently fixed the penalty at death. The court entered judgment accordingly.

The cause in number S004713 [Crim. No. 25438] is before us on automatic appeal from the judgment of death. (Pen. Code, § 1239, subd. (b); see Cal. Const., art. VI, § 11.) The cause in number S009001 is here on petition for writ of habeas corpus. (Cal. Const., art. VI, § 10.) On defendant's motion we have consolidated the appeal and the habeas corpus proceeding for purposes of oral argument and decision.

As will appear, we conclude that the appeal must be rejected and the judgment affirmed, and that the petition for writ of habeas corpus must be denied.

### I. APPEAL (No. S004713 [Crim. No. 25438])

#### A. *The Facts*

The evidence introduced at the guilt phase was based largely on two confessions defendant made to officers from the Tulare Sheriff's Department. It tells the following tale.

On the night of January 22, 1985, defendant and two companions, Christopher Scott Seaman and John Leroy Calhoun, met at the Showbiz Pizza Place in Visalia. Defendant was 18 years old, and Seaman and Calhoun were evidently about the same age; defendant had known Calhoun for some time but Seaman only about a week. The trio planned to become mercenaries for the so-called Karen National Liberation Army in Myanmar, former-

ly Burma, in what they viewed as a struggle against communism. Seaman owned weapons, the others did not. At their meeting, Seaman told defendant and Calhoun that he knew where they could get guns for their venture. With his guidance, the trio developed a plan: Alva Teague, a childhood friend of Seaman, collected guns and kept them in his bedroom at the home of his father and mother, Louis and Silva Teague, in a rural area outside Visalia; after 3 o'clock in the afternoon no one (Seaman said) would be home; they could take the weapons and make a clean getaway. The trio styled the enterprise a military-like "mission." Authority ran from Seaman, who was "commanding the mission" as its "leader"; through Calhoun, who was "senior" to defendant; down to defendant himself.

Evidently on January 23, Seaman, Calhoun, and defendant went to the Teague residence, surveyed the premises, and then departed. About 3 p.m. that same day, they returned; Seaman and Calhoun had driven in Seaman's Jeep while defendant had ridden on his motorcycle; each was dressed in military-like garb. On their arrival, the trio saw an automobile on the property and realized that someone might be at home. They discussed the matter and through a "general consensus" made an apparently tacit "commitment" to kill whomever they might find within in order to eliminate any potential "witnesses." Their plan was as follows: defendant would go in and secure the premises, and was handed a .357-caliber magnum handgun belonging to Seaman for that purpose; Calhoun would follow; and Seaman would remain outside as a lookout.

As defendant approached the house he gazed within and noticed a middle-aged woman, later identified as Silva Teague, sitting at a coffee table. He knocked on the door, she answered, he asked if "John" was home, she said no, he put his arm in the doorway, she slammed the door on his arm, but he forced his way in. Once inside, defendant held Teague on a couch with his handgun.

Calhoun then entered, armed with a .22-caliber carbine given him by Seaman, and exchanged weapons with defendant. Calhoun told defendant to make Teague lie down in the hallway; defendant complied. Calhoun began to gather weapons from Alva's bedroom. He told defendant to move Teague into the bathroom and make her lie face down on the floor; again defendant complied. At what defendant assumed was Seaman's direction, Calhoun gave him an "order" to kill Teague by moving an index finger across his throat.

Defendant "executed" his victim by firing four rounds from the carbine. "I put the flash suppresser [*sic*] on the base of the skull, the neck, and I tilted it back just a little bit for the angle so I'd come through right about the bridge of the nose—so I'd get a clear trajectory through her brain." "I didn't want to hurt her. I didn't want her to feel any pain. I wanted it to be over before she even knew it happened, so I made sure that I had a clear trajectory through the brain."

Calhoun and defendant gathered up three rifles, a shotgun, a handgun, ammunition, ammunition clips, an ammunition belt, and other items, and then left the house. They had found, but did not take, a single-shot .22-caliber rifle and a couple of air rifles—because, defendant said, they would be useless for fighting in the jungle.

Seaman, Calhoun, and defendant decided to flee the country in Seaman's Jeep. Defendant sold his motorcycle to the Visalia Cycle Center to obtain money for the escape. They set out for Mexico.

The following day, January 24, the trio was arrested outside of Needles. Defendant soon began to experience and express remorse for the killing. In his view, Seaman "coerced [him and Calhoun] pretty much" to "go in and remove the weapons from the house": "he was the one who came up with the idea—he was, information, uh, major instigator, well, without him nothing would have ever happened."

The defense presented no evidence on the issue of guilt.

At the penalty phase, the prosecution did not introduce any evidence. The defense offered the testimony of defendant's mother and grandmother, and of persons who knew him or his family. That testimony painted the following picture.

Defendant's father and mother lived together unmarried. She became pregnant; he went to jail; and she gave birth to defendant. About two years later, defendant's father returned; a few months after that, defendant's mother left because of his father's drinking and physical abuse, and she took defendant with her. The following years were happy; defendant was bright, enthusiastic, personable, good, and helpful.

All began to change in defendant's seventh year. His father returned. A year later, his parents married. His father was violent, explosive, and sadistic; he physically and verbally abused defendant and his mother, and

demanded that they obey his orders immediately and fully; they feared him. Defendant began to withdraw within himself, and eventually developed hypertension and peptic ulcers; he also began to escape through fantasy. In spite of all, he remained good and helpful. Indeed, on one occasion he saved another child from drowning. But he was shadowed by the cloud cast by his father: he was sad and depressed.

Early on, defendant became interested in the military and weaponry. In his teenage years, his interest grew and became virtually obsessive. And at 17 he enlisted in the Army after his mother gave permission. In military service he was happy. But after a short time, he suffered an injury and was honorably discharged. Returning home, he was lost. He drifted for a little while. He began to talk about becoming a mercenary. And then ensued the events that were the subject of the trial.

Defendant himself took the stand. He expressed remorse for the killing: "I feel a great deal of remorse. It was a terrible thing. And if it could be changed, if it was within my power, I would change it." He admitted he did not begin to experience remorse immediately after the crime. He explained: "Everything happened really very fast. I would say that I was almost—it was an automatic reaction. I was given an order. I followed the order explicitly. It wasn't until later on that I had time to think about what carrying out that order meant in terms of my life, in terms of other people's lives, in terms of that family, in terms of the friends and relatives of both sides." He said that in jail he read a good deal and studied German, and that if he was allowed to live he hoped to continue his education.

B. *Guilt Issues*

*Denial of Motion to Suppress*

Defendant's sole contention as to guilt is that the court erred when it denied a motion he made to suppress certain statements, including his two confessions. In the motion he argued that the first confession, which he made to officers on the night of his arrest in Needles, was involuntary and hence inadmissible: it was involuntary as a matter of law because he had invoked his right to counsel under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and any waiver of that right was ineffective; it was also involuntary as a matter of fact because he was impaired through deprivation of medication prescribed for hyperten-

sion. He argued that the second confession, which he made to officers four days later, was also involuntary and hence inadmissible: it was involuntary as the "tainted fruit" of the first assertedly involuntary confession; it was also involuntary because he was impaired through deprivation of his hypertension medication.

The court held a hearing. As relevant here, it found as follows with regard to the first confession. A few hours after his arrest, defendant was interrogated by Detective Sergeant Gary Harris and Detective Jay Salazar of the Tulare Sheriff's Department. He was advised of his *Miranda* rights. He initially invoked his right to counsel but immediately changed his mind, without intervention by Harris or Salazar, and said he would talk. He was asked whether he wished to proceed without counsel. He answered yes. He waived his rights under *Miranda*, including his right to counsel. He was not promised any benefit or threatened with any harm. He was not affected by his hypertension or the absence of hypertension medication. He then made a confession.

As relevant here, the court found as follows with regard to the second confession. After defendant, Seaman, and Calhoun were transported back to Tulare County, each expressed a desire to speak with Sergeant Harris. When Harris asked defendant what he wanted to discuss, defendant said personal matters, such as obtaining razor blades and cigarettes; Harris said he would like to discuss the Teague murder first; defendant agreed to do so. Defendant was advised of his *Miranda* rights again, and again waived those rights. He had a hidden "fear" that he had to cooperate with Harris in order to ensure favorable action as to the personal matters he wanted to discuss. Harris did not know of the "fear" and made no promises or threats. Defendant was not affected by his hypertension or the absence of hypertension medication. He then made another confession.

Determining, inter alia, that both waivers and both confessions were voluntary, knowing, and intelligent beyond a reasonable doubt, the court denied defendant's motion to suppress. ■ ■ ■ ■ As noted, the confessions were subsequently introduced at trial.[1]

Defendant contends the court's ruling was erroneous. He claims his first confession was inadmissible. ■ He argues his waiver of *Miranda* rights

---

[1] Of course, since the crimes herein were committed after June 9, 1982, the effective date of Proposition 8 (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149]), the court was required to make its determination of voluntariness only by a preponderance of the evidence. (*People* v. *Markham* (1989) 49 Cal.3d 63, 65 [260 Cal.Rptr. 273, 775 P.2d 1042].)

must be deemed ineffective: the federal and state constitutional guaranties of due process require that all advisements and waivers of *Miranda* rights made in a place of detention must be tape-recorded before the resulting confession can be considered voluntary—a "requirement" not met here. The argument is without merit. We accept what is evidently its major premise, i.e., due process demands whatever is necessary for fundamental fairness. But we cannot accept the minor premise, i.e., tape recording is necessary. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 755, fn. 17 [175 Cal.Rptr. 738, 631 P.2d 446] [implying as much in dictum at least insofar as the federal constitutional guaranty is concerned].)

■ Defendant argues his waiver of *Miranda* rights must be held ineffective on another ground: the United States and California Constitutions require the contemporaneous memorializing of *Miranda* advisements and waivers, and the preservation of such memorializations; Sergeant Harris took no notes; Detective Salazar did, but made no mention therein of advisement or waiver; the appropriate sanction is the exclusion of Salazar's testimony; and the exclusion of that testimony deprives the determination of voluntariness of necessary support. The argument lacks merit: we do not find in either the federal or state Constitution the requirement defendant claims he discerns therein.

■ Defendant argues his waiver of *Miranda* rights must be held ineffective as not voluntary, knowing, and intelligent: the court's determination to the contrary was without adequate support. On appeal, such a determination is reviewed independently. (E.g., *People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610] [speaking specifically of the question of voluntariness]; see generally *People* v. *Louis* (1986) 42 Cal.3d 969, 985-987 [232 Cal.Rptr. 110, 728 P.2d 180] [discussing standards of review].) Applying that standard, we find no error. Our review of the record in its entirety convinces us that the challenged determination was sound. Certainly, the finding that defendant was not affected by his hypertension or the absence of hypertension medication is amply supported.

■ Finally, defendant argues his waiver of his rights under *Miranda*, including his right to counsel, must be held ineffective because it was preceded by a violation of the "prophylactic rule" (*Michigan* v. *Harvey* (1990) 494 U.S. __, __ [108 L.Ed.2d 293, 110 S.Ct. 1176]; see *People* v. *Mattson, ante,* pp. 826, 859-862 [268 Cal.Rptr. 802, 789 P.2d 934]) laid down in *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880]: "[A]fter the right to counsel had been asserted by an accused, further interrogation of the accused should not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the

police.' " (*Oregon* v. *Bradshaw* (1983) 462 U.S. 1039, 1044 [77 L.Ed.2d 405, 411, 103 S.Ct. 2830] (plur. opn.), quoting *Edwards* v. *Arizona, supra,* at p. 485 [68 L.Ed.2d at p. 386].) There was no violation of the *Edwards* rule here. The court found in substance that after defendant asserted his right to counsel, Harris and Salazar did not proceed with interrogation until defendant himself reopened dialogue: as noted, the court found he initially invoked his right to counsel but immediately changed his mind, without intervention by Harris or Salazar, and said he would talk. This finding is amply supported. Accordingly, we reject the argument.

■ Defendant next claims his second confession was inadmissible. He argues Sergeant Harris improperly induced his confession by a promise to discuss personal matters on the condition that he first speak about the murder. But at the hearing defendant himself admitted that Harris made no such promise.

■ Defendant also argues his waiver of *Miranda* rights before his second confession must be held ineffective as not voluntary, knowing, and intelligent: the court's determination to the contrary was without adequate support. Here too, after independent review of the record in its entirety we are convinced that the challenged determination was sound. Again, there is ample support for the finding that defendant was not affected by his hypertension or the absence of hypertension medication.

■ Finally, defendant argues his waiver of his rights under *Miranda*, including his right to counsel, must be held ineffective because it was preceded by a violation of the *Edwards* rule. The predicate of the argument is evidently that defendant had asserted *and not waived* his rights before the second confession. But as the discussion above establishes, that predicate is unsound: defendant had waived his rights under *Miranda*, including his right to counsel, before the first interrogation.[2]

## C. *Penalty Issues*

### 1. *Prosecutor's Use of Peremptory Challenges Assertedly in Violation of the Eighth Amendment*

During voir dire, the prosecutor used his peremptory challenges (defendant claims) to systematically exclude all prospective jurors who expressed

---

[2]Defendant presents a number of other arguments in support of his contention. All are substantially reducible to arguments addressed and rejected above. None has merit.

reservations about the death penalty but were apparently not excludable for cause on that basis. ■ Defendant contends that by acting as he did the prosecutor violated his rights under the Eighth Amendment: he denied him a jury that was a representative cross-section of the community and as a result deprived him of a reliable determination as to penalty.

But as defendant himself recognizes, the substance of his claim was rejected in *People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another point in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149 [240 Cal.Rptr. 585, 742 P.2d 1306]: "[W]e see no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. While a statute requiring exclusion of all jurors with any feeling against the death penalty produces a jury biased in favor of death [citation], we have no proof that a similar bias arises, on either guilt or penalty issues, when *both parties* are allowed to exercise their equal, limited numbers of peremptory challenges . . . against jurors harboring specific attitudes they reasonably believe unfavorable. [Citation.] [¶] We recognize that a jury shorn of significant community viewpoints on an issue in the case is not ideally suited to the 'purpose and functioning of a jury in a criminal trial.' [Citation.] That, however, is a result inherent in the parties' historic and important right to exclude a limited number of jurors for fear of bias." Defendant argues the reasoning of *Turner* is unsound, but he is unpersuasive.

## 2. *Prosecutorial Misconduct*

Defendant contends that the prosecutor engaged in misconduct during summation at the penalty phase. He directs our attention to the following comments.

At one point the prosecutor stated: "In your deliberations, don't ever lose sight of what took place that day. Don't ever lose sight of Silva Teague in her own home that afternoon. [¶] Remember the manner in which she was held as a hostage. At gunpoint in her own home. [¶] Remember her situation. No one else can. But you, as jurors, recall the terror that must have been in her heart, in her mind at that time."

At another point the prosecutor said: "You've seen the pictures, you've seen the manner in which she was at when she was coldly executed in the privacy of her own home. [¶] All we can do at this point is look at these facts and try and imagine how she felt and what is the appropriate punishment for the acts of the person that is responsible for this act. [¶] We have

heard today and as well we should, whenever we are making a decision of this magnitude, we know something about the Defendant and you have to ask yourselves, does it change what was done on the 23rd of January, 1985 one iota? Does it change the terror? Does it change the act? Does it change the permanence? Does it change the absence in Louis Teague's life of Silva Teague? Does it change the absence in Alva Teague's life of his mother? Does it change anything for the relatives and the family in any way comforting to them what you heard today?"

At yet another point the prosecutor stated: "The background and childhood don't make the facts. This crime was atrocious."

■ Defendant claims it was improper for the prosecutor to argue that the mitigating evidence he offered was immaterial. A defendant, however, cannot complain on appeal of misconduct by the prosecutor at trial unless he made a timely assignment of misconduct and requested that the jury be admonished to disregard the improper remark. (E.g., *People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].) In this case defendant made no such assignment or request. It is true that the rule does not apply when the harm could not have been cured. (*Ibid.*) Such a situation, however, was not present here: any harm threatened by the prosecutor's comments was certainly curable. Moreover, in our view the prosecutor did not in fact make the argument defendant claims he did. In their context, his words would have been understood by the jurors to declare only that the mitigating evidence was insufficient, not that it was immaterial.

■ Defendant next claims it was improper for the prosecutor to comment on the emotional impact of the crime on Silva Teague's family. We agree. In *South Carolina* v. *Gathers* (1989) 490 U.S. 805, \_\_-\_\_ [104 L.Ed.2d 876, 883-884, 109 S.Ct. 2207], the United States Supreme Court concluded that it was generally violative of a criminal defendant's rights under the Eighth Amendment to present argument concerning such matters as the victim's personal characteristics, the emotional impact of the crime on his family, and the opinions of family members about the crime and the criminal. The court followed *Booth* v. *Maryland* (1987) 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-454, 107 S.Ct. 2529], in which it had concluded that it is generally violative of those same rights to introduce evidence relating to such matters.

Defendant then claims the impropriety requires reversal. We disagree. For errors of federal constitutional dimension, harmless-error analysis under the beyond-a-reasonable-doubt test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065],

is the rule and not the exception. (*Rose* v. *Clark* (1986) 478 U.S. 570, 576-579 [92 L.Ed.2d 460, 469-471, 106 S.Ct. 3101].) In our view, the rule governs here. (*People* v. *Lewis, ante,* 262,284-285 [266 Cal.Rptr. 834, 786 P.2d 892].) Under *Chapman*, the impropriety here was nonprejudicial. The objectionable comment was relatively brief and unemphatic, and was of minimal significance within the penalty phase as a whole. Hence, we conclude the impropriety was harmless beyond a reasonable doubt.

 Finally, defendant claims it was improper for the prosecutor to comment on what he said was the terror Silva Teague must have experienced. He says the remarks were mere speculation. They were not: they constituted a reasonable inference from the evidence. He next says the remarks did not bear on a material issue. They did: they directly related to the circumstances of the crime. In *People* v. *Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776], we explained: "In [the penalty-determining] process, one of the most significant considerations is the nature of the underlying crime. [Citation.] Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing." Defendant then says the remarks were inflammatory. They were not: they were fleeting and relatively neutral. Last, he says the remarks amounted to argument in violation of *Gathers* and *Booth*. They did not: as stated above, they related to the circumstances of the crime in a direct and non-inflammatory way; they did not cross the constitutional barrier marked by those cases into such forbidden areas as Silva Teague's personal characteristics, the emotional impact of the crime on her family, and the opinions of members of her family about the crime and the criminal.

### 3. *Instruction on Penalty Factors*

At defense counsel's request and in conformity with language he drafted, the court instructed the jury in relevant part as follows.

"In determining which penalty is to be imposed on defendant, RYAN MICHAEL MARSHALL, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

"(b) The presence or absence of criminal activity by the defendant, other than the present offense, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) The age of the defendant at the time of the crime.

"(e) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death.

"I have previously read to you the list of aggravating and mitigating circumstances which the law permits you to consider.

"The listed aggravating circumstances are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances in aggravation in reaching a determination as to the appropriate punishment for defendant RYAN MICHAEL MARSHALL.

"In this part of the trial, the law does not forbid you from being influenced by sympathy for the defendant. However, the law does forbid you from being governed by mere conjecture, prejudice, or public opinion.

"Each of you is free to assign to defendant and defendant's background whatever moral or sympathetic value you deem appropriate.

"There has been no evidence presented of other criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. This circumstance should therefore be viewed as a circumstance in mitigation.

"There has been no evidence presented that defendant has been convicted of any prior felony. This circumstance should therefore be viewed as a circumstance in mitigation.

"Defendant RYAN MICHAEL MARSHALL was 18 years old when he committed the crimes of which you have found him guilty.

"If defendant had been under 18 years old when the crimes were committed, he would be subject to neither life imprisonment without possibility of parole nor the death penalty.

"You must consider the defendant's age only as a mitigating factor, to be accorded whatever weight you believe it deserves; you may not under any circumstances consider defendant's age as an aggravating factor.

"You are instructed that in determining the appropriate penalty for defendant, you may consider as a circumstance in mitigation the defendant's potential for rehabilitation and leading a useful and meaningful life while incarcerated.

"In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence, you may not consider for any reason whatsoever the deterrent or non-deterrent effect of the death penalty in general, or the monetary cost to the state of execution or maintaining a prisoner for life."[3]

 Defendant now contends that the court erred by instructing the jurors as it did on the penalty factors. Specifically, he argues that the instruction improperly omitted two factors defined in Penal Code section 190.3 (hereafter section 190.3): "Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct" (*id.*, par. 6, factor (f)); and "Whether or not defendant acted under extreme duress or under the substantial domination of another person" (*id.*, par. 6, factor (g)).

We reject the claim under the doctrine of invited error. In *People v. Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311], we explained: "The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal." (*Id.* at p. 330.) Defense counsel must be deemed to have intentionally caused the claimed "error." It is manifest that he requested the challenged instruction in order to structure the issues as favorably as he could in view of the case he had chosen to present. It is also manifest that in making the relevant decisions he acted reasonably. The defense case and the instruction were tailored the one to the other.

Defendant argues that the doctrine of invited error does not apply. He reads *Wickersham* to hold that the doctrine "is not invoked unless counsel

---

[3] We quote the penalty instructions as they appear on the written forms and are recorded in the clerk's transcript, and not as orally delivered and recorded in the reporter's transcript: at the jury's request, the court sent the written forms into the jury room during deliberations. It must be noted, however, that the instructions as recorded in the clerk's transcript are not significantly different from the instructions as recorded in the reporter's transcript.

*articulated* a tactical basis for [his] choice" of the instruction subsequently attacked (32 Cal.3d at p. 332, italics added)—a condition not met here. Considered in context, the *Wickersham* holding is limited to situations in which the court is under an obligation to instruct sua sponte in a manner other than it did. We plainly implied as much when we "noted that the question posed [in the seminal case of *People* v. *Graham* (1969) 71 Cal.2d 303 (78 Cal.Rptr. 217, 455 P.2d 153)] was whether 'the trial court's affirmative duty to instruct the jury on its own motion . . . can be nullified by waiver of defense counsel.' " (32 Cal.3d at p. 331.)

Defendant claims that the court is under an obligation to instruct on all the statutory penalty factors sua sponte.

It is, of course, the better practice for a court to instruct on all the statutory penalty factors, directing the jury to be guided by those that are applicable on the record.

Such an instruction "ensures that the jury is aware of the complete range of factors that the state considers relevant to the penalty determination. With that knowledge the jury is better able to place the individual defendant's conduct in perspective, and thus its exercise of discretion to select the appropriate penalty is further channeled and directed as required by the Eighth Amendment." (*People* v. *Jennings* (1988) 46 Cal.3d 963, 988 [251 Cal.Rptr. 278, 760 P.2d 475].)

Such an instruction also avoids the risk that a factor that is indeed applicable on a given record may nevertheless be erroneously omitted. (See *People* v. *Jennings, supra*, 46 Cal.3d at p. 988.) This risk is grave insofar as the defendant's interests are concerned: "deletion of any potentially mitigating factors from the statutory list could substantially prejudice the defendant." (*People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250] [decided under the relevantly similar 1977 death penalty law, Stats. 1977, ch. 316, § 4 et seq., p. 1256 et seq.]; accord *People* v. *Jennings, supra*, 46 Cal.3d at p. 988.)

Nevertheless, it is not the law that the court is obligated to instruct on all the statutory penalty factors sua sponte. (See *People* v. *Lucky* (1988) 45 Cal.3d 259, 296-297 [247 Cal.Rptr. 1, 753 P.2d 1052].) It is true that section 190.3 states that "In determining the penalty, the trier of fact shall take into account any of the . . . [statutory penalty] factors if relevant," and that "the trier of fact shall consider, take into account and be guided by" such factors. That provision may be read to impliedly require instruction on any

factor *that is applicable on the record of the individual case*. But it cannot reasonably be construed to mandate instruction on all factors in every case sua sponte.[4]

 Accordingly, we reject the claim of error as invited.[5]

### 4. *Brown Error*

 Defendant may be understood to contend that the court erred under *People* v. *Brown, supra*, 40 Cal.3d 512, 538-544, by instructing the jury as it did on the process by which penalty is to be determined.

---

[4] There is language in such cases as *People* v. *Douglas* (1990) 50 Cal.3d 468, 537 [268 Cal.Rptr. 126, 788 P.2d 640], *People* v. *Miranda* (1987) 44 Cal.3d 57, 105 [241 Cal.Rptr. 594, 744 P.2d 1127], and *People* v. *Guzman* (1988) 45 Cal.3d 915, 965 [248 Cal.Rptr. 467, 755 P.2d 917], that may be read to support the proposition that a court must instruct on all the statutory penalty factors sua sponte. But in light of the discussion presented above, that language can no longer be considered controlling.

[5] Defendant also contends that the instruction on the penalty factors was erroneous under the Eighth Amendment because its "catch-all" provision may have led the jurors to entertain the belief—incorrect under *People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 [196 Cal.Rptr. 309, 671 P.2d 813], and *People* v. *Brown* (1985) 40 Cal.3d 512, 537 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]—that "mitigating evidence" includes only such evidence as may extenuate the gravity of the crime. In other words, he claims the court committed so-called "*Easley* error" by inadequately instructing the jurors on the scope of mitigating evidence.

In *Boyde* v. *California* (1990) 494 U.S. __ [108 L.Ed.2d 316, 110 S.Ct. 1190], the United States Supreme Court held that "The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence" under the Eighth Amendment "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition." (*Id*. at pp. __, __ [108 L.Ed.2d at p. 329].) It appears to follow that the same standard is applicable for reviewing jury instructions claimed to restrict impermissibly a jury's sentencing discretion under the Eighth Amendment.

Under the reasonable-likelihood standard, we find no error. Indeed, we believe that the jury would have understood the instruction to declare that "mitigating evidence" included not only "extenuating" evidence but also any other "sympathetic" evidence, *whether or not relevant to defendant's culpability for the offense*. The very words of the instruction expressly directed the jurors to take into account *not only* "Any . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," *but also* "any . . . aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death."

Therefore, we conclude that the court adequately informed the jurors of the scope of mitigating evidence. Defendant disagrees with our conclusion, but does not undermine its soundness. Certainly, as explained above (see pt. I.C.2, *ante*), the prosecutor's summation would not have misled the jurors in this regard. Hence, on this record we find no *Easley* error.

The final paragraph of section 190.3 declares in relevant part: "the trier of fact . . . *shall* impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." (Italics added.)

In *Brown* we construed this provision as follows in part to avoid the serious Eighth Amendment questions we believed[6] would arise if the trier of fact were deprived of discretion to decline to fix the penalty at death. "In this context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . . By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (40 Cal.3d at p. 541, fn. omitted.)

Although in *Brown* we upheld the constitutionality of the final paragraph of section 190.3, we nevertheless recognized that when delivered in an instruction that provision's mandatory-penalty-determination language might mislead jurors as to the scope of their sentencing discretion, to the defendant's prejudice, in violation of what we believed to be Eighth Amendment principles. (40 Cal.3d at p. 544, fn. 17.) Specifically, a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale' " (*id.* at p. 541). In other words, he might be misled as to the nature of the process by which penalty is to be determined. A juror might also reasonably understand the language to require him to vote for death if he finds that aggravation outweighs mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.) That is to say, he might be misled as to the character of the ultimate question to be resolved in the process of determining penalty.

---

[6] Whether the soundness of our belief is affected by *Blystone* v. *Pennsylvania* (1990) 494 U.S. __ [108 L.Ed.2d 255, 110 S.Ct. 1078], is a question we need not, and do not, address here.

In this case, the court's instruction on the determination of penalty could not possibly have misled the jury in violation of *Brown*. This is because the instruction conformed closely to that decision. It was as follows.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances and that the imposition of the death penalty in this case is justified and appropriate, you may impose a sentence of death.

"To return a death judgment, you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating evidence that it warrants death instead of life imprisonment without possibility of parole.

"The weighing process is not mathematical or mechanical, but a means to reach a reasoned decision about the appropriate penalty.

"You are free to reject the death penalty in this case if you decide, based on any evidence presented, that it is not the appropriate punishment."

Accordingly, on this record we cannot find *Brown* error: the jury was adequately instructed on the scope of its sentencing discretion. Hence, there is no reasonable likelihood that the instruction imposed a restriction impermissible under the Eighth Amendment.

5. *Failure to Instruct on the Burden of Proof Beyond a Reasonable Doubt as to Aggravating Circumstances*

 Defendant contends in substance that the court erred by failing to instruct the jurors to the following effect: (1) they could consider a circumstance in aggravation only if they were satisfied of its existence beyond a reasonable doubt; (2) they could fix the penalty at death only if they found that the aggravating circumstances outweighed the mitigating beyond a reasonable doubt; and (3) they could so fix the penalty only if they determined that death was appropriate beyond a reasonable doubt.

Defendant rests his claim on two assertions. The first is that the cruel and unusual punishments and due process clauses of the Eighth and Fourteenth

Amendments to the United States Constitution and article I, sections 7, 15, and 17 of the California Constitution require imposition on the prosecution of the burden of proof beyond a reasonable doubt as to each of the issues identified above. They do not. (E.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

The second assertion is that the equal protection clauses of the Fourteenth Amendment and article I, section 7 of the California Constitutuion require imposition of that burden on the prosecution. Of course, principles of equal protection prohibit dissimilar treatment for similarly situated persons. Contrary to defendant's claim, no relevant dissimilarity appears here: neither capital defendants nor noncapital defendants have their penalties fixed under the standard of proof beyond a reasonable doubt. That persons can be committed as "mentally disordered sex offenders" (former Welf. & Inst. Code, § 6300 et seq., added by Stats. 1967, ch. 1667, § 37, p. 4107 et seq., and repealed by Stats. 1981, ch. 928, § 2, p. 3485) or narcotics addicts (Welf. & Inst. Code, § 3000 et seq.) only on proof beyond a reasonable doubt as to the facts underlying such commitment (*People* v. *Burnick* (1975) 14 Cal.3d 306, 314-332 [121 Cal.Rptr. 488, 535 P.2d 352] [mentally disordered sex offenders]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 345-347 [121 Cal.Rptr. 509, 535 P.2d 373] [same]; *People* v. *Thomas* (1977) 19 Cal.3d 630, 637-641 [139 Cal.Rptr. 594, 566 P.2d 228] [narcotics addicts]) does not undermine our conclusion. Such facts are in nature jurisdictional and not dispositional.

6. *Court's Response to Jury's Request to Define "Aggravating" and "Mitigating" Circumstances*

During deliberations, the jury sent the following written request to the court: "Define Aggrivating [*sic*] & Mitigating Circumstances[.]" With the assistance of the prosecutor and defense counsel, the court prepared a written response, which it called an "additional instruction," and gave it to the jury: "To return a death judgment you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating evidence that it warrants death instead of life without parole. In other words, the jury must be persuaded that the 'bad' evidence is so substantial in comparison with the 'good' that it warrants death instead of life without parole. *People* v. *Brown* (1985) 40 Cal.3d 512, 542[.] [¶] (Also review the instructions you have, some of which specifically delineate which circumstances are agravating [*sic*] and which are mitigating.)"

█ Defendant contends that the court erred by responding to the jury's request as it did. He claims the "additional instruction" was nonre-

sponsive and misleading. We disagree. Although it did not define "aggravating circumstances" and "mitigating circumstances" as clearly and directly as possible, the instruction did indeed define those terms: the jurors would have inferred that "aggravating circumstances" meant " 'bad' evidence" and "mitigating circumstances" meant " 'good' evidence." While we do not approve of the court's elementary definition, contrary to defendant's assertion it was in fact responsive and not misleading. (See *People* v. *Brown, supra,* 40 Cal.3d at pp. 541-542, fn. 13.)

Defendant may also be understood to claim that the "additional instruction" may have misled the jury as to the scope of mitigating evidence and/or the scope of sentencing discretion, in violation of the principles defined in *People* v. *Easley, supra,* 34 Cal.3d 858, 877-878, and *People* v. *Brown, supra,* 40 Cal.3d 512, 538-544. But as we concluded above, the jurors were given adequate instructions under *Easley* (see pt. I.C.3, *ante*) and *Brown* (see pt. I.C.4, *ante*). There is no reasonable likelihood that they were led to depart from them by the instruction here.

### 7. *Ruling on "Disproportionality" Motion*

Defendant contends that the court erred by ruling as it did on certain issues bearing on the proportionality of the penalty of death under provisions including the cruel and unusual punishments clauses of the Eighth Amendment to the United States Constitution and article I, section 17, of the California Constitution.

After the jury returned the verdict of death, defendant moved the court, in substance, to undertake to resolve the following questions: (1) whether the penalty was disproportionate to his personal culpability ("individual" disproportionality); (2) whether the penalty was disproportionate to the punishment meted out to his companions, Seaman and Calhoun ("intracase" disproportionality); and (3) whether the penalty was disproportionate to the sentences imposed on assertedly similarly situated persons ("intercase" disproportionality). He also moved the court to consider, in resolving these questions, evidence that he proffered concerning those "similarly situated" persons.

The court agreed to conduct "individual" and "intracase" proportionality review, and proceeded to determine no disproportionality existed. It declined to conduct "intercase" proportionality review. And it refused to consider the proffered evidence in making its ruling.

■■■ Defendant claims the court erred when it found no "individual" disproportionality. ■■■ The ruling is subject to independent review: it resolves a mixed question that implicates constitutional rights and hence must be deemed predominantly legal. (See generally *People* v. *Louis, supra*, 42 Cal.3d at pp. 985-987.) After such review, we find no error.

To be sure, "The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's 'personal responsibility and moral guilt.' [Citations.] Article I, section 17, of the California Constitution separately and independently lays down the same prohibition." (*People* v. *Poggi* (1988) 45 Cal.3d 306, 349 [246 Cal.Rptr. 886, 753 P.2d 1082] (conc. & dis. opn. of Mosk, J.); see *In re Lynch* (1972) 8 Cal.3d 410, 414-439 [105 Cal.Rptr. 217, 503 P.2d 921] [discussing predecessor of Cal. Const., art. I, § 17]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697] (plur. opn.) [following *Lynch* in discussing Cal. Const., art. I, § 17]; *id.* at p. 489 (conc. opn. of Reynoso, J.) [concurring in plurality's discussion].)

■■■ We recognize that arguably defendant is not the most heinous murderer and that his crime is not the most abominable murder. But there is no blinking the fact that after planning and in cold blood he executed a helpless woman in order to eliminate a witness. In view of that fact, we cannot conclude that death is disproportionate to defendant's personal responsibility and moral guilt.

■■■ Next, defendant claims the court erred when it found no "intra-case" disproportionality. ■■■ For the reasons stated above, this ruling too is subject to independent review. After such review, we find no error. ■■■ "Unless the state's capital punishment system is shown by the defendant to operate in an arbitrary and capricious manner, the fact that such defendant has been sentenced to death and others who may be similarly situated have not does not establish disproportionality violative of constitutional principles." (*People* v. *McLain* (1988) 46 Cal.3d 97, 121 [249 Cal.Rptr. 630, 757 P.2d 569].) ■■■ The required showing was not made. At the time relevant here, only defendant and Seaman had faced trial. A jury chose the death penalty for defendant, who was a major participant in the murder as the triggerman. Another jury chose the same penalty for Seaman, who was a major participant in the crime as the ringleader.[7]

---

[7] At oral argument, counsel for respondent represented that Seaman's death verdict was subsequently set aside by the trial court on grounds of instructional error; learning that Seaman was terminally ill, the prosecution declined to seek the ultimate sanction in subsequent proceedings; Seaman was then sentenced to life imprisonment without possibility of parole.

 Finally, defendant claims the court erred by declining to conduct "intercase" proportionality review. But such review by a trial court is not required; indeed, it is not authorized. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1043 [264 Cal.Rptr. 386, 782 P.2d 627].)[8]

### 8. *Ruling on Verdict-modification Application*

Defendant made an application for modification of the verdict of death under Penal Code section 190.4, subdivision (e) (hereafter section 190.4(e)). The court denied the request. Defendant contends that the reasoning of the ruling was fundamentally flawed and the ruling should be set aside, that the judgment should be vacated as to penalty, and that the cause should be remanded for reconsideration of the application. To properly address the claim, we must set out the statement in its entirety.

"This ruling is made pursuant to the requirement of Penal Code Section 190.4(e) which provides that the defendant shall be deemed to have made an application for modification of the jury's verdict.

"In ruling on this application, the Court must review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Penal Code Section 190.3, and shall make a determination whether the jury's findings and verdict that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or to the evidence presented. The reasons for the Court's findings must be stated on the record.

"In this particular case the Court finds that the evidence concerning the truth of the special circumstances is overwhelming. The Court specifically agrees with the jury's findings that the circumstances in aggravation outweighs [*sic*] the circumstances in mitigation, and that these findings are supported by the weight of the evidence. The aggravating circumstances are so substantial in comparison with the mitigating circumstances that they warrant a punishment of death rather than life without possibility of parole.

"The Court now states for the record its reasons for its findings and the reasons for its ruling on this application.

---

[8] Defendant also claims that the court erred by refusing to consider the evidence he proffered concerning assertedly similarly situated persons when it declined to conduct "intercase" proportionality review. The point is without merit. Of course, "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) And "relevant evidence" means "evidence . . . having any tendency in reason to prove or disprove any disputed fact *that is of consequence to the determination of the action.*" (*Id.*, § 210, italics added.) Defendant proffered the evidence in question to prove "intercase" disproportionality. But because the court was without authority to rule on the issue, the evidence did not have a tendency to prove or disprove a fact that was of consequence.

"All of the evidence that the jury considered in making its determination concerning the appropriate penalty has been examined and reviewed by this Court. The Court has examined all of the exhibits admitted into evidence, studied the daily transcript of the proceedings both on the guilt issue, the special circumstances issues, and the question of the issue of aggravating and mitigating factors concerning the selection of which [of the] two penalties would be appropriate. The Court has compared the daily transcript with its *own personal notes relating to the presentation of the evidence* as to all phases of the case.

"From all the evidence admitted at the guilt phase of the trial, the Court is satisfied beyond all reasonable doubt that the defendant is guilty of murder of the first degree, and that the special circumstances of murder committed while engaged in the commission of a robbery and while engaged in the commission of a burglary are true beyond all reasonable doubt.

"This Court has re-examined the evidence offered in the penalty phase by the defense and finds beyond any reasonable doubt that there was no circumstance which extenuated the gravity of the crime, whether or not it be a legal excuse. None of the witnesses called could offer any explanation or give any evidence of any conceivable circumstance that the Court finds would extenuate the gravity of this crime. The evidence which the defense offered concerning the defendant's extenuation was merely as to his background and the abuse he suffered at the hands of his stepfather [*sic*]. The members and friends of the defendant's family who testified did not, in the Court's opinion, present any evidence which the Court would find to be a moral justification or extenuation for defendant's conduct.

"The Court finds that the following factors of mitigation were established by the evidence:

"(1) The absence of any prior criminal activity by defendant involving the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(2) The absence of any prior felony conviction.

"(3) The age of the defendant at the time of the crime. He was eighteen (18) years of age.

"(4) Circumstances concerning the environment in which the defendant was raised, his character and background that were offered by defendant as a basis for a sentence less than death.

"(5) The defendant's expression, during the penalty phase, of guilt and remorse for his criminal acts.

"The Court finds that evidence received during the trial of this case establishes the following penalty factors:

"(1) The circumstances of the crimes of which defendant was convicted and the existence of two special circumstances found to be true, and which included the following:

"(a) The burglary of the residence was planned in advance.

"(b) The defendant armed himself before entering the house.

"(c) He forced his way into the residence against resistance by the victim.

"(d) Once inside the house, defendant held the victim captive at gun point.

"(e) A tacit commitment was made beforehand that if anyone was at home, they would be eliminated. [Citation.]

"(f) The reason for eliminating the victim was to prevent her from being a witness. [Citation.]

"(g) The defendant had sufficient time to deliberate upon the course of conduct he was about to take, and within minutes after being given the order to kill Mrs. Teague, defendant, without pause or hesitation and without showing the slightest compassion, murdered Mrs. Teague.

"(h) A lack of evidence showing that defendant was under the influence of extreme mental or emotional disturbance.

"(i) The defendant never gave any reason as justification for his act other than he merely followed orders and that he killed Mrs. Teague to prevent her from being a witness.

"(j) Defendant never suggested that he was acting under duress or that he was substantially dominated by another person when he made his decision to kill Mrs. Teague.

"(k) He made no effort to disabuse his companion, John Calhoun, of his notion that Mrs. Teague had to be killed.

"(l) The defendant was not an accomplice to the killing, nor did he aide [*sic*] and abet the killing. *He was a direct principal to the killing.* He took Mrs. Teague into the bathroom; he directed her to assume a position on the bathroom floor that would facilitate the execution; and he was the person who carefully positioned her head at the proper angle to insure direct passage of the bullet into her brain.

"(m) The defendant, in his confession statement, did not express any remorse for this killing when he was first asked about it by Detective Harris.

". . . . . . . . . . . . . . . . . . . . .

"Accordingly, considering all of the evidence, the Court's assessment is that the factors in aggravation beyond all reasonable doubt outweigh those in mitigation . . . .

"The automatic motion for modification of the jury's verdict as to this defendant is denied . . . ." (Italics in original.)

 In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to "make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 793; accord *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1252 [255 Cal.Rptr. 569, 767 P.2d 1047].) That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. (See *People* v. *Allison* (1989) 48 Cal.3d 879, 914-916 [258 Cal.Rptr. 208, 771 P.2d 1294] (conc. opn. of Kaufman, J.).) And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves. (*Ibid.*)

 Defendant claims that the court's reasoning is fundamentally flawed in six respects. His first complaint is that the court erroneously refused to consider the evidence that he proffered concerning the sentences imposed on assertedly similarly situated persons. "Under section 190.4(e), the court reviews the evidence presented to the jury . . . ." (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].) The proffered evidence, however, was not presented to that body.

 Defendant's second complaint is that the court erroneously failed to find his cooperation with the police to amount to a circumstance in mitigation. But he simply does not persuade us that the court was required to make such a finding.

■ Defendant's third complaint is that the court erroneously believed that only such evidence as may extenuate the gravity of the crime can be mitigating and as a result failed to consider evidence that might not have been extenuating but could nevertheless have served as a basis for a sentence less than death. The argument is not persuasive.

Plainly, the court believed that "nonextenuating" evidence could be mitigating, and it actually considered such evidence. Indeed, it found mitigation in such circumstances unrelated to the offenses for which defendant was on trial as: "The absence of any prior criminal activity by defendant involving the use or attempted use of force or violence or the express or implied threat to use force or violence"; "The absence of any prior felony conviction"; "The age of the defendant at the time of the crime. He was eighteen (18) years of age"; "Circumstances concerning the environment in which the defendant was raised, his character and background that were offered by defendant as a basis for a sentence less than death"; and "The defendant's expression, during the penalty phase, of guilt and remorse for his criminal acts."

It should also be recalled that the court had instructed the jurors that they "should . . . view[]" as "circumstance[s] in mitigation" the lack of evidence that defendant engaged in "other criminal activity . . . which involved the use or attempted use of force or violence or the express or implied threat to use force or violence," and the lack of evidence that "defendant has been convicted of any prior felony." Those circumstances were totally unrelated to the offenses for which defendant was on trial.

We recognize that the court stated that it "has re-examined the evidence offered in the penalty phase by the defense and finds beyond any reasonable doubt that there was no circumstance which extenuated the gravity of the crime . . . ." That statement does not imply a belief that only such evidence as may extenuate the gravity of the crime can be mitigating. It merely declares that the mitigating evidence actually offered by defendant was not in fact extenuating.

■ Defendant's fourth complaint goes to the sole circumstance in aggravation, viz., the circumstances of the crime. He claims the court erroneously found aggravation in the fact that "The burglary of the residence was planned in advance." He argues advance planning is an "essential element" of burglary and hence cannot aggravate the crime. He is wrong: advance planning is *not* an element.

■ Defendant's fifth complaint also relates to the circumstance in aggravation. He claims the court erroneously made the following findings:

(1) "Defendant never suggested that he was acting under duress or that he was substantially dominated by another person when he made his decision to kill Mrs. Teague"; and (2) "The defendant, in his confession statement, did not express any remorse for this killing when he was first asked about it by Detective Harris."

The record refutes the first claim. As the court all but expressly determined, there was no evidence that defendant killed Silva Teague within the meaning of the duress-or-domination factor of section 190.3, i.e., under "*extreme* duress" or "*substantial* domination."

The record refutes the second claim as well. Defendant did not express any remorse for killing Silva Teague when *first* asked by Sergeant Harris. "Q Do you have any regrets? A Yes, I do. Q Do you have any remorse? A Yes, I do, *because I wanted to go to Mandalay.* Q You wanted to what? A I wanted to go to Mandalay. Q So the remorse and regret you feel is the fact that your plans have now been altered, right? A No, the remorse and regret is that I was forced into doing something that caused me to be permanently diverted from getting to Mandalay. Q Magdalay? A Mandalay. Q Mandalay? A M-a-n-d-a-l-a-y. Q Okay. And that's where you feel the regret and the remorse? A I feel the regret and remorse that circumstances had to be this way." (Italics added and paragraphing omitted.) It was only on Harris's prompting that defendant expressed remorse for killing Teague. "Q What about the lady? A She's at peace. Q She's at peace? Is that what you said? A Yes. Q Do you feel no remorse whatsoever for the fact that you murdered her? A Yes, I do, but she's at peace at least." (Paragraphing omitted.)

■■■ Defendant's sixth and final complaint goes as well to the circumstance in aggravation. He claims the court erroneously considered the absence of certain potentially mitigating facts to amount to aggravation. The point is well taken. Contrary to the court's evident belief, aggravation is *not* established by the absence of mitigation in the form of extreme mental or emotional disturbance (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-289 [221 Cal.Rptr. 794, 710 P.2d 861] (plur. opn.)), reasonable belief as to moral justification or extenuation (see *ibid.*), extreme duress or substantial domination (see *ibid.*), relatively minor participation (see *ibid.*), or remorse (see *People* v. *Dyer* (1988) 45 Cal.3d 26, 82 [246 Cal.Rptr. 209, 753 P.2d 1]). But there is no reasonable possibility the error affected the ruling. The harm threatened was the inflation of the circumstance in aggravation. But we do not believe such inflation resulted here. In substance, the improper aggravating facts merely restated proper aggravating facts—which showed that after planning and in cold blood, defendant executed a helpless woman in

order to eliminate a witness. Hence, we presume that such facts carried little if any marginal weight.

### 9. *"Cumulative" Prejudice*

■ Defendant contends in substance that when they are considered together, the penalty phase errors in this case require reversal. But "Even when his life is at stake, ' "[a] defendant is entitled to a fair trial but not a perfect one." ' " (*People v. Williams, supra*, 45 Cal.3d at p. 1333.) From our review of the record, we are convinced that defendant did indeed receive a fair trial on the issue of penalty.

### 10. *Constitutionality of the 1978 Death Penalty Law*

Defendant contends that the 1978 death penalty law is unconstitutional in several respects and that as a result the penalty of death imposed on him is unsupported as a matter of law.

■ Defendant claims the law is violative of principles of equal protection under both the Fourteenth Amendment to the United States Constitution and article I, section 7, of the California Constitution because it fails to provide defendants condemned to death with disparate sentence review—a "benefit" given to defendants convicted under the Determinate Sentencing Act. But "in our view, persons convicted under the death penalty law are manifestly not similarly situated to persons convicted under the Determinate Sentencing Act and accordingly cannot assert a meritorious claim to the 'benefits' of the act under the equal protection clause [citation]." (*People v. Williams, supra*, 45 Cal.3d at p. 1330.)[9]

■ Defendant next claims the law is violative of principles established in the double jeopardy clause of the Fifth Amendment, the cruel and unusual punishments clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment because it allows the "triple use" of the same facts—i.e., to support (1) the conviction of first degree murder on a theory of felony murder, (2) the finding of the felony-murder special circumstance, and (3) the imposition of the penalty of death. But as defendant himself recognizes, the underpinnings of his argument have been removed by such decisions as *People v. Gates* (1987) 43 Cal.3d 1168, 1188-

---

[9] Defendant also claims that the law is violative of principles of due process of law under both the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution because of its failure to provide capital defendants with disparate sentence review. We reject the point at the threshold as not properly raised: defendant perfunctorily asserts the claim without argument in support. (*People v. Bonin* (1989) 47 Cal.3d 808, 857, fn. 6 [254 Cal.Rptr. 298, 765 P.2d 460].)

1190 [240 Cal.Rptr. 666, 743 P.2d 301], and *People* v. *Anderson, supra,* 43 Cal.3d at page 1147. Indeed, in *Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 241-246 [98 L.Ed.2d 568, 579-583, 108 S.Ct. 546], the United States Supreme Court made it plain that the "triple use" of the same facts did not offend the cruel and unusual punishments clause.

Defendant's main complaint appears to be that the felony-murder special circumstance does not provide the "meaningful basis [required by the Eighth Amendment] for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." (*Furman* v. *Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726] (conc. opn. of White, J.).) But in *People* v. *Anderson, supra,* 43 Cal.3d at page 1147, we squarely rejected that very point.

■■■■ Finally, defendant claims that by allowing the "triple use" of the same facts the law violates principles of equal protection under the Fourteenth Amendment: the multiple use of facts is allowed under the death penalty law, but not under the Determinate Sentencing Act; persons convicted under the former are similarly situated to persons convicted under the latter; the dissimilar treatment is not justified; therefore, the denial of the benefit of "no multiple use" to capital defendants is improper. The argument falls with its premise: as explained above, persons convicted under the death penalty law are *not* similarly situated to persons convicted under the Determinate Sentencing Act.

### 11. *Proportionality of Death to Defendant's Personal Culpability*

■■■■ Defendant contends that the penalty of death is disproportionate to his personal responsibility and moral guilt under the cruel and unusual punishments clauses of the Eighth Amendment to the United States Constitution and article I, section 17, of the California Constitution. But for the reasons stated above (see pt. I.C.7, *ante*), we cannot agree.[10]

### 12. *Request for "Intercase" Proportionality Review*

Defendant asks us to undertake "intercase" proportionality review of his sentence of death. But "Because the United States Constitution does not require such review [citation] and defendant fails to set forth compelling reasoning or authority in support, we decline his request." (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 158 [249 Cal.Rptr. 320, 756 P.2d 1348].)

---

[10] Defendant also claims the evidence was insufficient to support the penalty of death. The point essentially restates the substance of the "proportionality" arguments considered above in various contentions. Those arguments were unpersuasive there. They are unpersuasive here as well.

In any event, as stated above, "Unless the state's capital punishment system is shown by the defendant to operate in an arbitrary and capricious manner, the fact that such defendant has been sentenced to death and others who may be similarly situated have not does not establish disproportionality violative of constitutional principles." (*People* v. *McLain, supra*, 46 Cal.3d at p. 121.) The required showing has not been made. We have considered the evidence to which defendant has directed our attention concerning assertedly similarly situated persons. ▆▆ ▆▆▆ ▆▆▆▆ That evidence, however, does not show that in this sense the capital punishment system operates arbitrarily or capriciously.[11]

## II. HABEAS CORPUS (NO. S009001)

During pendency of his appeal, defendant filed a petition for writ of habeas corpus attacking the judgment of death.

He claimed, inter alia, that his right to the effective assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution was violated when trial counsel failed to attempt to bar reference to certain assertedly prejudicial statements he had made to a prosecution psychiatrist, Dr. James R. Richmond, during a pretrial interview, in the event Richmond testified for the prosecution at the penalty phase. He alleged that during the interview he stated, for example, that he had engaged in a number of incidents of violence as a child and youth; he had wanted to kill his father; and he had been trained in jungle fighting by certain groups he refused to name. It turned out that Dr. Richmond did not testify. No reference was made to the statements in question.

Defendant also claimed that a juror introduced extraneous law into the penalty deliberations and thereby engaged in prejudicial misconduct. He alleged that during deliberations Juror Richard Gildez "informed the jury . . . [that he had a] background in law enforcement, and that the lack of evidence did not mean the defendant has no criminal background, because juvenile records are automatically sealed at 18 years of age."

We ordered the Director of the Department of Corrections to show cause why defendant should not be granted relief on the two grounds referred to

---

[11] Having reviewed the record in its entirety, we conclude that the jury found that defendant actually killed, *and* intended to kill, Silva Teague within the meaning of *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]. We also conclude that these findings are amply supported and adopt them as our own. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].)

above. The director filed a return through the Attorney General. And defendant filed a traverse.

■ We first consider defendant's claim of ineffective assistance of trial counsel. To succeed, defendant must establish: (1) counsel's performance was deficient, i.e., " 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms' "; and (2) counsel's deficient performance subjected the defense to prejudice, i.e., " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839] [discussing both federal and state constitutional rights], quoting *Strickland* v. *Washington* (1984) 466 U.S. 668, 687, 688, 694 [80 L.Ed.2d 674, 693-694, 697-698, 104 S.Ct. 2052] [discussing federal constitutional right].)

■ In an attempt to establish deficient performance, defendant argues that it was objectively unreasonable for trial counsel not to have attempted to obtain a ruling from the court, or a "formal" and "unequivocal" commitment from the prosecutor, barring reference to the assertedly prejudicial statements he made to Dr. Richmond. The argument is unpersuasive.

First, defendant does not appear to show that there was a meritorious basis on which trial counsel could have sought the ruling in question. Prior to trial, counsel moved to suppress defendant's interview with Dr. Richmond on *Miranda* grounds. He was unsuccessful: the court determined, inter alia, that defendant had been properly advised of his rights under *Miranda*; had effectively waived those rights; and had voluntarily given the interview.

Defendant now maintains that trial counsel should have moved to bar reference to the statements in question on other grounds. One such ground on which defendant says counsel should have relied is that his detention at the time of the interview was illegal: he should have been arraigned by that time, but had not been. ■ But "an illegal detention does not automatically render a confession [or other statement] inadmissible . . . ." (*People* v. *Carrera* (1989) 49 Cal.3d 291, 323 [261 Cal.Rptr. 348, 777 P.2d 121].) Under the rule of *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883], "a defendant must show the detention 'produced the admissions' or there was 'an essential connection' between the two events . . . ." (*People* v. *Carrera, supra*, at p. 324, quoting *People* v. *Thompson, supra*, at pp. 329-330.) ■ Defendant states that the alleged delay in arraignment denied him the prompt appointment of counsel and thereby deprived him of counsel's expected advice not to consent to the interview. But by so stating he asserts "nothing more than a 'but for' relationship

between his prearraignment detention and the [interview]. His argument would, contrary to the rule in *Thompson*, [citation], render inadmissible virtually every statement obtained during the period of an illegal detention, for in each such case the defendant could argue that but for the delay, counsel would have been appointed and would have advised against the making of any statement." (*People* v. *Carrera, supra*, at p. 324.)

Another such ground on which defendant says counsel should have relied is that the statements in question were irrelevant or in any event substantially more prejudicial than probative. But he simply does not show that the statements would not have been relevant and indeed highly probative as to the basis of any opinion Dr. Richmond might have given on the witness stand.

Second and determinative, the record establishes that trial counsel did in fact obtain a commitment from the prosecutor barring reference to the statements in question. Evidently at an unreported conference in chambers, counsel moved to preclude the statements or at least took the position that they were inadmissible. Later in open court, the prosecutor declared on the record that he would make no reference to the statements. Whether his commitment is labeled "formal" and "unequivocal" is of no consequence here. It was unmistakably clear and definite.

Accordingly, we cannot find deficient performance on the part of trial counsel in the matter of which defendant now complains. Therefore, we must reject the ineffective assistance claim.

We next consider defendant's claim of jury misconduct. ▮ To succeed, defendant must show misconduct on the part of a juror; if he does, prejudice is presumed; the state must then rebut the presumption or lose the verdict. (See, e.g., *In re Stankewitz* (1985) 40 Cal.3d 391, 396-402 [220 Cal.Rptr. 382, 708 P.2d 1260].)

▮ Defendant has sufficiently alleged misconduct. As noted, during penalty deliberations Juror Gildez "informed the jury . . . [that he had a] background in law enforcement, and that the lack of evidence did not mean the defendant has no criminal background, because juvenile records are automatically sealed at 18 years of age."

By declaring that "juvenile records are automatically sealed at 18 years of age," Gildez introduced into the jury room *extraneous* law, i.e., law not given to the jury in the instructions of the court (*In re Stankewitz, supra*, 40 Cal.3d at p. 397).

By so declaring, he also introduced *erroneous* law. Contrary to the comment's clear implication, evidence of juvenile criminality is *not* barred from the penalty phase of a capital trial as a matter of law: "section 190.3, factor (b), making evidence of criminal activity involving force or violence admissible as a factor in aggravation, [includes] criminal activity of juveniles" (*People* v. *Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270]).

Of course, the introduction of extraneous law, whether erroneous or not, constitutes misconduct. (*In re Stankewitz, supra*, 40 Cal.3d at pp. 399-400.)

The Attorney General argues to the contrary. We agree with his major premise. The introduction of much of what might strictly be labeled "extraneous law" cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. "[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors." (*Rideau* v. *Louisiana* (1963) 373 U.S. 723, 733 [10 L.Ed.2d 663, 669, 83 S.Ct. 1417] (dis. opn. of Clark, J.).) Moreover, under that "standard" few verdicts would be proof against challenge.

But although we agree with the major premise of the Attorney General's argument, we cannot agree with the minor. Gildez's comment simply cannot be characterized as a general statement about the law that finds its source in everyday life and experience. Gildez declared that it was the law that "juvenile records are automatically sealed at 18 years of age." And he vouched for his declaration on the strength of his "background in law enforcement."

Whether or not the presumption of prejudice raised by juror misconduct is rebutted must now be addressed. We believe that the question should be resolved through the following prejudice analysis.

■ A judgment adverse to a defendant in a criminal case must be reversed or vacated "whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury." (2 ABA Stan-

dards for Criminal Justice, std. 8-3.7 (2d ed. 1980) p. 8.57; see, e.g., *In re Winchester* (1960) 53 Cal.2d 528, 534 [2 Cal.Rptr. 296, 348 P.2d 904] [implying that the issue is whether "a juror might have been improperly influenced by" extrinsic material]; *United States* v. *Vasquez* (9th Cir. 1979) 597 F.2d 192, 193 [stating that "the key question is whether there exists a possibility that [extrinsic] information influenced the verdict"].) This rule "has significant support in the case law" (2 ABA Standards for Criminal Justice, *supra*, std. 8-3.7, Commentary, p. 8.58), both within California (see *People* v. *Stokes* (1894) 103 Cal. 193, 198-199 [37 P. 207]) and without (see *State* v. *Kociolek* (1955) 20 N.J. 92, 100 [118 A.2d 812]). (See ABA Project on Standards for Criminal Justice, Stds. Relating to Fair Trial and Free Press (Approved Draft 1968) std. 3.6, Commentary, p. 148.)

"The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror." (2 ABA Standards for Criminal Justice, *supra*, std. 8-3.7, Commentary, p. 8.58.)

Such "prejudice analysis" is different from, and indeed less tolerant than, "harmless-error analysis" for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice. (See *Rose* v. *Clark*, *supra*, 478 U.S. at pp. 577-578.) Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial.

 In this case, the presumption of prejudice has been rebutted. Juror Gildez's misconduct could not have produced any significant effect. As noted, Gildez merely attempted to explain *why* evidence of criminal background, if any, had not been introduced. It is true that his comment supported an inference that defendant might have had a criminal background even though evidence of such background was not presented. But such an inference was immaterial under the penalty charge given. The court did not instruct that defendant did *not* have a criminal background. Rather, as related above, it instructed that evidence of such background was absent and hence that mitigation was present as a matter of law: "There has been

no evidence presented of other criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. This circumstance should therefore be viewed as a circumstance in mitigation. [¶] There has been no evidence presented that defendant has been convicted of any prior felony. This circumstance should therefore be viewed as a circumstance in mitigation."

Defendant claims that Juror Gildez's comment had a tendency to occasion speculation that he had a criminal background, and that evidence of that background had been barred by a legal "technicality." In support he directs our attention to the following written question sent to the court by the jury: "During the penalty phase, does the prosecution have a right to present witnesses that were not called by the defense?"

We are not persuaded that defendant's claim is in fact supported by the jury's question: Gildez's comment and the jurors' query do not appear to be connected. In any event, as explained above defendant's criminal background *vel non* was immaterial under the penalty charge given. Moreover, any possible speculation would have been checked by the court's written response: "Yes. [¶] During the penalty phase both the prosecution and the defense may present any additional evidence that the law allows as an aggravating or mitigating circumstance. Neither side need present any additional evidence at the penalty phase if they choose not to."

Defendant argues that the response would in fact have fueled speculation. The jurors, he says, would have understood the words, "any additional evidence that the law allows as an aggravating or mitigating circumstance," as though they were, "any additional evidence, *which the law allows*, as an aggravating or mitigating circumstance." And understanding the words thus, he maintains, the jurors might have incorrectly inferred the existence of a legal "technicality" barring evidence of juvenile criminality.

We do not agree. Surely, the jurors would have understood the words, as they were written, to mean "any additional evidence that the law *recognizes* as an aggravating or mitigating circumstance." Such an understanding is supported, if not compelled, by the final sentence of the response—"Neither side need present any additional evidence at the penalty phase if they choose not to." That sentence clearly implies that the prosecution is permitted to present any additional evidence it chooses to.

In view of the foregoing, we conclude that the misconduct in question does not support a finding that there is a substantial likelihood that any juror was impermissibly influenced to the defendant's detriment. Therefore, we must hold the misconduct to be nonprejudicial.

### III. Disposition

For the foregoing reasons, we conclude that the appeal must be rejected and the judgment affirmed in number S004713 (Crim. No. 25438), and that the petition for writ of habeas corpus in number S009001 must be denied.

It is so ordered.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

Appellant's petition for a rehearing was denied July 18, 1990.