Filed 9/17/15  P. v. Zapata CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BERNARDO SANCHEZ ZAPATA,<br><br>        Defendant and Appellant. | A139209<br><br>(Contra Costa County<br>  Super. Ct. No. 51220763) |

This is an appeal from judgment after a jury convicted defendant Bernardo Sanchez Zapata of second degree robbery (three counts), false imprisonment by force (one count), and attempted carjacking (one count), with enhancements as to each count for personal use of a deadly weapon (to wit, a knife).  Defendant challenges the judgment on grounds that include ineffective assistance of counsel, failure to instruct the jury on voluntary intoxication, prosecutorial misconduct, cumulative error and sentencing error.  For reasons set forth below, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 18, 2012, a criminal information was filed charging defendant with the following:  second degree robbery (counts one, four and five) (Pen. Code, §§ 211/212.5), attempted carjacking (count two) (Pen. Code, §§ 215/664), and false imprisonment by force (count three) (Pen. Code, §§ 236/237, subd. (a)), with an

1

enhancement alleged for each count for personal use of a knife within the meaning of Penal Code section 12022, subdivision (b)(1)).[1]

Trial began in May 2013, at which the following evidence was presented.

## I. Counts Four and Five.

At about midnight on May 27, 2012, Korina Carpenter (Carpenter) and Anjelika Johnson Alfaro (Johnson Alfaro) were walking home on Virginia Lane in Concord. They noticed a man, later identified as defendant, on the sidewalk in front of them slashing tires on parked cars with a knife. Defendant was wearing jeans and a baggy, dark sweatshirt. Carpenter moved to the middle of the street to avoid him, while Johnson Alfaro continued walking on the sidewalk. Defendant approached Johnson Alfaro, asking where she was from and "who do you roll with?" Defendant then waved his knife at Johnson Alfaro and asked what she had with her. When Johnson Alfaro responded that she had nothing, defendant grabbed her purse from her arm. She noticed that he had a small moustache and spoke with a Spanish accent.[2]

Defendant then approached Carpenter and said in a heavy Spanish accent: "Give me your shit" (or something similar). Carpenter described defendant as shaved with a fade haircut and sunglasses. When defendant pointed his knife at her stomach, Carpenter ripped off her necklace and gave it to him. Defendant then demanded her cell phone charger, which she also gave to him. At this point, a car approached and stopped. Defendant opened the car door and brandished his knife, causing the driver to speed away. Defendant also ran away, and the women went to a nearby McDonalds to call 911.

Carpenter and Johnson Alfaro were interviewed by the police at McDonalds. They were also taken to a show-up with three men that police officers had stopped in a truck near the McDonalds. Carpenter told the police that one man resembled the robber,

---

[1]     Unless otherwise stated, all statutory citations herein are to the Penal Code.

[2]     At trial, Johnson Alfaro could not remember how defendant's hair was cut, however her memory was refreshed when she was read her police statement, in which she described his haircut as a fade.

but that she was not sure. Johnson Alfaro stated that none of the men resembled the robber.

A second show-up was later held the same night, at which defendant was presented to the women. Carpenter told the police that she was "just about certain" defendant was the robber, while Johnson Alfaro stated that "it looked like him."

At defendant's preliminary hearing in December 2012, Carpenter testified that she was not sure if defendant was the robber, explaining "because at night it was kind of, like, a blur." She noted that she only saw his face for three to five seconds on the dark street. She further explained that her attention was more focused on the robber's knife than his face. She did not notice anything in particular about the robber's teeth.

At trial, Johnson Alfaro testified that defendant "looked like" the robber, except that the robber wore sunglasses during the robbery. When shown defendant's booking photograph, she then stated with 100 percent certainty that defendant was the man who robbed her.

## II.    Counts One, Two, and Three.

Between 11:30 p.m. and midnight on May 27, 2012, Mayra Martinez parked her car near her apartment building on Virginia Lane in Concord, and was walking toward her apartment. Defendant confronted her with a knife, demanding money. Martinez told defendant she had none, so he instead demanded her car keys and cell phone, grabbing them from her hands. Defendant told Martinez to stay put, while he took her keys and attempted to open a nearby car that was not hers. When the door would not open, defendant returned the keys to Martinez and told her to show him her car. Martinez complied, and defendant told her to get into the passenger seat. Defendant then grabbed Martinez from behind. She told him he could take her car, but that she did not want to go with him. Defendant, however, got behind her with the knife and held it about an inch from her stomach, telling her to get into the car. Martinez unlocked the passenger door, slid over to the driver's seat, locked the vehicle and drove away as defendant banged on the window. As she drove off, defendant punctured her driver's side rear tire with his knife.

3

During this time, Jessica Diaz, one of Martinez's neighbors, could hear her screams for help. Diaz went to a window, where she witnessed much of the incident, although she could not see defendant's face or whether he was armed. Diaz later described the robber to police as Hispanic, about five feet, ten inches tall, and wearing a black hoodie with tan shorts. However, Diaz acknowledged to the officers that she could not make a clear identification because the robber had been wearing a hood during the incident.

Martinez, who drove to her boyfriend's house immediately after the incident, returned home a short while later, where she was interviewed by the police. She was then taken to a show-up with three men at a nearby McDonalds. She told police that none of the men resembled the person who robbed her.

Later the same night, Martinez was talking to police officers back at her apartment building when she saw defendant walking up the stairs with two others. She immediately identified defendant to the officers. She confirmed that, although defendant had changed clothes (and was now wearing a white sweatshirt with colors), she was nonetheless sure he was the robber. The officers thus ordered defendant to stop; however, he continued on to a nearby apartment. Eventually, the officers brought defendant out of the apartment, at which time he was wearing a white tank top. The police then conducted another show-up at McDonalds, during which Martinez again identified defendant as the robber.

### III.  Defendant's Police Interview.

After waiving his *Miranda* rights, defendant denied committing any crimes. Defendant told police that he had been at a family gathering on Jenkinson Drive before returning to his own apartment on Monument Boulevard with his father-in-law. Defendant then drove with his father-in-law to a friend's apartment on Virginia Lane, where he was arrested. Defendant told Detective Daniel Smith that he had been wearing sunglasses earlier in the night, but had misplaced them. Defendant accused another man, Ricardo Sanchez, of robbing Carpenter and Johnson Alfaro. He also said Sanchez had asked him for a ride to 1411 Monument Boulevard. Detective Smith later described

4

defendant as smelling strongly of alcohol and being so intoxicated that he cried throughout much of the interview. The detective also noted defendant had stained teeth.

Following an investigation, police were unable to locate "Ricardo Sanchez" or any of the stolen property.

## IV. The Verdicts, Sentencing and Appeal.

On May 16, 2013, the jury convicted defendant on all counts and found true the enhancements for personal use of a knife. On June 26, 2013, the trial court sentenced defendant to a total term of seven years, eight months in prison. Specifically, the trial court imposed the middle three-year term on count one with an additional one-year term for the enhancement; one-half the middle term on count two with an additional one-year term for the enhancement; a consecutive eight-month term on count three (1/3 the two-year middle term) with an additional four-month term for the enhancement (1/3 the one-year middle term); and one-year terms on counts four and five (1/3 the three-year middle term) with additional four-month terms for the enhancements (1/3 the one-year middle term). The court then stayed imposition of the sentence on count two pursuant to section 654. This appeal followed.

## DISCUSSION

Defendant raises the following issues on appeal. First, defendant contends he received ineffective assistance of counsel because his attorney failed to ask the court to appoint an expert witness on eyewitness identifications. Second, defendant contends the trial court erred by failing to sua sponte instruct the jury on his defense of voluntary intoxication. Alternatively, defendant contends that, even if the trial court did not have this sua sponte duty, his attorney provided him ineffective assistance by failing to request instruction on voluntary intoxication. Third, defendant contends the prosecutor committed prejudicial misconduct by vouching for witnesses and referencing his failure to testify on his own behalf in front of the jury. Fourth, defendant contends that cumulative errors at trial requires reversal. Lastly, defendant contends the trial court erred by declining to apply section 654 to stay imposition of his sentence on count three,

5

false imprisonment by force, and the associated enhancement for personal use of a knife. We address each claim in turn below.

## I.  Ineffective Assistance of Counsel.

Defendant contends his constitutional rights to due process and effective assistance of counsel were violated by his attorney's failure to ask the court to appoint an expert witness on eyewitness identifications to challenge his identification by the victims as the perpetrator of the charged crimes. (U.S. Const., 6th Am., 14th Am.) The governing law is not in dispute.

To prevail on a claim of ineffective assistance of counsel, the defendant must prove more than a failure by counsel to undertake a particular strategy or investigation. Rather, "defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) In meeting this standard, the defendant must overcome a strong presumption that counsel's conduct was sound trial strategy or otherwise within the wide range of reasonable professional assistance. (*People v. Burnett* (1999) 71 Cal.App.4th 151, 180; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1215.) Moreover, "prejudice" in this context occurs only where defense counsel's deficient performance " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686.) If "a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

Applying these principles to the facts at hand, we conclude defendant's challenge to his attorney's performance fails on two grounds – to wit, he has failed to prove either deficient professional performance or resulting prejudice.

With respect to the quality of defense counsel's representation, we first note that the decision to call a particular witness – including an expert witness in the area of psychological factors impacting eyewitness identifications – is generally a discretionary

6

matter rather than a legal requirement. (See, e.g., *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995 ["Expert testimony on the psychological factors affecting eyewitness identification is often unnecessary"]; *People v. McDonald* (1984) 37 Cal.3d 351, 377 [whether to admit or exclude expert testimony on psychological factors impacting eyewitness identification "remains primarily a matter within the trial court's discretion"], overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) And, here, significantly, we do not know why defense counsel failed to seek appointment of such an expert, given that she was never asked. As such, the law requires us to affirm on this ground unless there simply is no reasonable explanation for her conduct. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) The record in this case reflects otherwise.

Generally speaking, expert testimony is admissible where the area of expertise is "sufficiently beyond common experience" that such testimony would assist the trier of fact. (Evid. Code, § 801; *People v. McDonald, supra,* 37 Cal.3d at p. 373.) As already noted, expert testimony in the area of psychological factors impacting eyewitness identification is not necessarily called for in many cases. And, here, defendant identifies nothing specific to his case that would uniquely *require* such expert testimony. For all we know (which is little or nothing), defense counsel may have consulted with such an expert and decided his or her testimony was not required in this case. (See *People v. Datt* (2010) 185 Cal.App.4th 942, 953 [concluding that, where "defendant has failed to establish that his trial counsel failed to consult an expert or that such an expert would have been able to provide favorable testimony, he has not shown that his trial counsel was deficient in failing to present expert eyewitness identification testimony"].)

It is true, of course, that the defense focused on the theory that the three eyewitnesses misidentified defendant as the perpetrator of the crimes. However, defense counsel spent a quite significant amount of time at trial, both in cross-examination and summation, drawing the jury's attention to numerous factors sufficient to undermine the eyewitnesses' identifications. Specifically, defense counsel elicited from the victim eyewitnesses (and, in particular, from Johnson Alfaro and Carpenter) that they harbored some degree of doubt as to whether defendant was the perpetrator given the fact that their

7

interaction with the perpetrator was brief, it was dark during the robbery, and the perpetrator wore dark sunglasses. In addition, the victims were distracted during the incident by the perpetrator's knife. As defense counsel noted in her closing argument, Carpenter initially identified another person as the perpetrator before "flip-flopping" after being shown defendant.[3] Defense counsel then highlighted the general facts that "[e]yewitness identification is unreliable" and "the single greatest cause of wrongful convictions." She also discussed the multitude of factors that "affect accurate perception and memory," such as a witness's age and sophistication, whether the crime was violent in nature, and the lighting at the crime scene. Finally, defense counsel argued that, where, as here, a weapon is involved, "the focus is going to be on the knife and not on the person," – to wit, the very subject that defendant contends on appeal that an expert witness would have addressed.

In addition to these arguments from defense counsel, we point out that the psychological factors impacting eyewitness identifications are also the subject of a jury instruction, CALCRIM No. 315, which was given to the jury in this case. This instruction advised jurors to consider before accepting or rejecting an eyewitness identification factors such as lighting, the duration of the encounter, the distance between the perpetrator and eyewitness, the degree of attention paid by the eyewitness to the perpetrator, whether the eyewitness was nervous, scared or in distress, and whether both individuals were the same or different race. These are the same factors defendant contends would have been addressed by an expert. Yet defendant offers no explanation as to why the jury could not have properly assessed these factors based upon their own common knowledge and experience.

In these circumstances, we agree with the People that defendant has failed to meet his burden to prove that no plausible explanation exists for his attorney's failure to ask the court to appoint an expert witness to testify on this subject. Indeed, rarely will this

---

[3]     Defense counsel noted other discrepancies in the eyewitnesses' testimony, including their inconsistent reports of what the perpetrator looked like and wore on the night in question.

8

court reverse based upon a defense counsel's purported tactical error, as it is not our role to judge an attorney's decisions during the course of trial in the "harsh light of hindsight." (*People v. Hinton* (2006) 37 Cal.4th 839, 876.)  And, in this case, in the absence of any clear facts indicating defense counsel made a tactical error during trial by not calling an expert witness to challenge the eyewitness identification, we will let her decision stand.

Finally, in any event, even aside from defendant's failure to prove deficient performance from counsel, we would nonetheless conclude no prejudice exists on this record.  To begin where we just left off, the jury was instructed, per CALCRIM No. 315, to consider the very factors defendant contends the expert witness would have covered. The jury was also instructed that the prosecution had the burden to prove defendant's guilt beyond a reasonable doubt.  Thus, given these clear instructions, which we presume the jury followed, as well as the absence of any showing by defendant that an expert would have provided specific evidence relating to the identifications that would have made a difference to his case, we conclude his challenge must fail.  (*People v. Datt, supra,* 185 Cal.App.4th at p. 952; *People v. Kipp, supra,* 18 Cal.4th at p. 366.)

## II.  Absence of Instruction on Voluntary Intoxication.

### A.  Failure of the Trial Court to Sua Sponte Instruct.

Defendant next argues that the trial court erred by failing to instruct sua sponte that the jury should consider his voluntary intoxication in determining whether he had the requisite specific intent to commit the crimes of robbery and attempted carjacking.  As the record reflects, the jury was given the standard instructions relating to the intent required to support convictions for robbery, attempted carjacking and false imprisonment by force (CALCRIM Nos. 251, 1600, 1650, and 1240); however, the jury was not given a specific instruction relating to voluntary intoxication and its effect on the jury's consideration of the requisite intent.  This argument, however, goes nowhere, as the California Supreme Court, to which we must defer, has already decided this precise issue. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1119; accord *People v. Bolden* (2002) 29 Cal.4th 515, 559.)  Rejecting the same argument raised here, the California Supreme Court explained that, "under the law relating to mental capacity as it exists today, it

makes more sense to place on the defendant the duty to request an instruction which relates the evidence of [defendant's] intoxication to an element of a crime, such as premeditation and deliberation. This is so because the defendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such a case the defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him (See 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2925, pp. 3586-3587), but such a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court. The court did not err, therefore, in failing to instruct sua sponte." (*People v. Saille, supra*, 54 Cal.3d at p. 1120.)

Accordingly, we reject defendant's argument without further analysis under the well-established principle of stare decisis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### B. Ineffective Assistance Based upon Defense Counsel's Failure to Request Instruction.

Defendant raises the alternative argument that, even if the trial court had no sua sponte duty to instruct on the defense of voluntary intoxication, his attorney rendered ineffective assistance by failing to request such an instruction. As noted above, however, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) The reason is this. A strong presumption exists that counsel's conduct falls within the wide range of reasonable professional assistance. As such, " ' "the defendant must overcome the presumption that, under the circumstances, the challenged action '*might be considered sound trial strategy*.' " ' " (*People v. Burnett, supra,* 71 Cal.App.4th at p. 180, quoting

10

*People v. Bunyard, supra,* 45 Cal.3d at p. 1215 and *Strickland v. Washington, supra,* 466 U.S. at p. 689, italics added.)

Here, the appellate record contains no explanation for defense counsel's failure to request a jury instruction relating to defendant's voluntary intoxication. At no time was defense counsel asked to explain this failure, nor did she offer an explanation for it, either directly or indirectly. As such, under the standards set forth above, we must reject defendant's claim of ineffective assistance of counsel on direct appeal " 'unless there simply could be no satisfactory explanation.' (*People v. Pope* (1979) 23 Cal.3d 412, 426.)" (*People v. Kipp, supra,* 18 Cal.4th at p. 367.)

Having reviewed the record, we conclude a plausible tactical explanation exists for defense counsel's failure to request a voluntary intoxication instruction, and thus that defendant's ineffective assistance claim must fail. The defense at trial was that defendant had been misidentified as the perpetrator of the crimes, not that he was too intoxicated to form the requisite intent to commit the crimes. As such, defense counsel may have reasonably concluded that, as a tactical matter, it was preferable not to call attention to defendant's alcohol consumption or intoxication, but rather to focus on discrepancies in the witnesses' testimony identifying him as the perpetrator of the crimes, or factors impacting their capacity to correctly identify the knife-wielding perpetrator. While defendant suggests defense counsel should have done both – focused on his intoxication *and* misidentification – it is not our role on appeal to second guess an attorney's decision regarding matters of trial strategy. And finally, given the by-all-means comprehensive set of instructions read to the jury regarding the prosecution's burden to prove each element of each crime beyond a reasonable doubt – including the element of intent – there is no basis for finding prejudice on this record even if we could find deficient performance by counsel (which we cannot). Accordingly, because defendant cannot prove that defense counsel's deficient performance " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result,' " his second challenge based upon ineffectiveness of counsel likewise fails. (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

11

### III. Prosecutorial Misconduct.

#### A. Vouching for the Credibility of Witnesses.

Defendant next contends the prosecutor repeatedly engaged in prejudicial misconduct by vouching for the credibility of witnesses. The governing law is this.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*). As such, when alleged prosecutorial misconduct occurred in the presence of the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.) Further, if prosecutorial misconduct is established, the question remains whether the misconduct was prejudicial, which, in turn, requires a showing by the defendant that it is reasonably probable a result more favorable to the defendant would have occurred if the prosecutor had refrained from the misconduct. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.) Prosecutorial misconduct requires reversal under federal law unless the misconduct was harmless beyond a reasonable doubt. (*People v. Cook* (2006) 39 Cal.4th 566, 608.)

With respect to defendant's first claim of prosecutorial misconduct, a prosecutor "is generally precluded from vouching for the credibility of her witnesses, or referring to evidence outside the record to bolster their credibility or attack that of the defendant." (*People v. Anderson* (1990) 52 Cal.3d 453, 479.) More specifically, a prosecutor may not " 'place the prestige of [his] office behind a witness by offering the impression that [he] has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [his] comments

cannot be characterized as improper vouching. [Citations.]' [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

The relevant record on this issue is as follows. First, defendant challenges as improper vouching the prosecutor's comments that, "there's something about the human nature and especially in trauma. I mean, I know it can be argued, well, it was traumatic, discount everything. It goes both ways, and that's what's left for you to decide after hearing the evidence what you feel about it. *But what I saw in the women's testimony is a realness and honesty.*" (Italics added.) At this point, defense counsel objected, and the trial court agreed, warning the prosecutor and admonishing the jury: "You're not to argue your personal belief. The jury will disregard that."

Second, defendant challenges these later remarks by the prosecutor: "[A]n hour after being apprehended, [defendant] goes down to the station, waives [his] *Miranda* [rights], signs off on a form with two separate officers in the room despite it not being recorded, *you got to judge their credibility. Because they didn't record it, were they fabricating? I mean, I – no.*" (Italics added.) Defense counsel again objected, and the court admonished the prosecutor not to "express your personal opinion about the facts."

Lastly, defendant challenges the prosecutor's line of argument when addressing Carpenter's eyewitness identification. Acknowledging that Carpenter was nervous and uncertain when she identified defendant at the preliminary hearing, the prosecutor stated: "in court, again, she said, no, I'm just about positive that's the guy. *These are all people that live in that community. They're not going to get the wrong person. They're not out to do the wrong –* " (Italic added.) Defense counsel raised another vouching objection, which the court sustained, admonishing the prosecutor, "please do not vouch."

Having reviewed this record, we conclude defendant has failed to demonstrate the prosecutor's comments were so deceptive or reprehensible that "there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.) As the record reflects, the trial court sustained several of defense counsel's objections, and admonished the prosecutor not to vouch or otherwise express any personal opinions with respect to the

13

witnesses' credibility. Consistent with the court's admonishment, the prosecutor ultimately concluded his closing argument by telling the jury: "The[] [victims] got to testify. And *it's up to you to decide if you find them honest, and you find they actually saw him and could ID him in court.*" (Italics added.) Moreover, the jury was repeatedly instructed not to consider the attorneys' statements or argument as evidence (CALCRIM Nos. 104, 222), and to follow the court's instructions to the extent an attorney's comment on the law appears inconsistent (CALCRIM No. 200). Finally, the court instructed the jury that it "alone must judge the credibility or believability of witnesses" (CALCRIM Nos. 105, 226). We presume, as the law requires, that the jury followed these clear instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) Accordingly, under the law set forth above, defendant's challenge fails.

### B. Commenting on Defendant's Failure to Testify.

Defendant further contends the prosecutor engaged in prejudicial misconduct by "blatantly remind[ing] the jury that [he] did not testify." More specifically, defendant challenges the prosecutor' statement that: "You know, the defendant has an absolute right not to testify. And you cannot consider that -- " We agree with the trial court that the prosecutor was simply "stating the law" rather than engaging in misconduct.

"Under the rule in *Griffin*, error is committed whenever the prosecutor or the court comments, either directly or indirectly, upon defendant's failure to testify in his defense. It is well established, however, that the rule prohibiting comment on defendant's silence does not extend to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Medina* (1995) 11 Cal.4th 694, 755; see also *People v. Lewis* (2001) 25 Cal.4th 610, 670 [under *Griffin*, a prosecutor may "comment on the state of the evidence, 'including the failure of the defense to introduce material evidence or to call witnesses' "].)

Here, the prosecutor remarked that defendant had "an absolute right not to testify" and that "you cannot consider it for anything." Defendant insists these remarks violated *Griffin* because, in reality, the prosecutor was attempting to remind the jury of his failure

14

to testify.  However, defendant points to nothing aside from the statements themselves to support his argument, other than a separate statement by the prosecutor asking why defense counsel failed to call *defendant's father-in-law* as a witness given defendant's alibi that he was with his father-in-law at the relevant time.  Neither "showing" provides a basis to find reversible error.  First, defense counsel's failure to call the father-in-law as a witness does not implicate *defendant's* right not to testify.  As such, the prosecutor was well within permissible bounds when alerting the jury to potential problems with defendant's alibi.  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1339 ["a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand"].)  And, second, as we have already explained, the law requires us to presume the jury properly followed the court's instructions in the absence of any evidence to the contrary.  (*People v. Delgado, supra,* 5 Cal.4th at p. 331.)  Here, the jury was clearly instructed that "defendant has an absolute constitutional right not to testify" (CALCRIM No. 355).  The challenged statement by the prosecutor was wholly consistent with this instruction.  The jury was also instructed that "[n]either side is required to call all witnesses who may have information about the case" (CALCRIM No. 300). Given this record, there is simply no basis for reversal under *Griffin*.

## IV.    Cumulative Trial Error.

In addition to arguing that each alleged trial error raised on appeal requires reversal, defendant argues that the cumulative impact of these errors requires reversal because the errors, considered together, cannot be proved harmless beyond a reasonable doubt.  We disagree.  As we have seen, few errors were committed at trial, and no error affected the jury's verdict.  As such, this argument provides no basis for reversal.  (See *People v. Marshall* (1990) 50 Cal.3d 907, 945 ["defendant is entitled to a fair trial but not a perfect one"].)

## V.     Sentencing Error.

Defendant's remaining argument is that the trial court erred when imposing the sentence on count three – to wit, eight months for false imprisonment by force, and four months for the associated enhancement for personal use of a knife.  According to defendant, the court should have stayed this sentence pursuant to section 654.

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654.)  As the California Supreme Court explains, where different provisions of law punish in different ways a defendant's single criminal act or course of criminal conduct, section 654 bars multiple punishments based upon that single act or course of conduct.  (*People v. Jones* (2012) 54 Cal.4th 350, 352.) "[T]he accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.' "  (*Id.* at p. 353.)

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]"  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

Here, defendant argues that section 654 bars the court's imposition of a separate sentence for count three, false imprisonment by force and four months for the knife use enhancement, because the "false imprisonment [count] constituted the fear or force elements for the robbery and attempted carjacking."[4]

Below, when urging the court to reject defendant's section 654 argument, the prosecutor argued that, when defendant committed the false imprisonment offence, he had "formed a new intent, a new plan that distinguishes that [offense] and merits a

---

[4]     The trial court stayed imposition of sentence on count two, attempted carjacking, pursuant to section 654.

separate punishment." The prosecutor elaborated that, while the robbery and attempted carjacking shared a common intent to steal, the false imprisonment involved "an entirely different intent" because defendant had already taken Martinez's possessions. The court accepted this argument. We conclude for reasons that follow the court had a proper evidentiary basis for declining to apply section 654. (See *People v. Macias* (1982) 137 Cal.App.3d 465, 470 [a finding of multiple objectives must be supported by substantial evidence].)

As defendant notes, both the false imprisonment by force offense and attempted carjacking offense involved a single victim, Martinez. The record, which is set forth in greater detail above (pp. 3-4, *ante*), reflects that defendant approached Martinez in the parking area of her apartment building around 11:30 p.m. Holding a large knife, he demanded her money. When Martinez said she had none, defendant demanded and took her car keys and cell phone. Defendant thereafter attempted to use Martinez's keys to open the wrong car before he returned the keys and instructed her to unlock her car. Martinez told defendant to take her car, but leave her behind. Defendant, however, who had moved behind her with the knife held just an inch from her stomach, told her to get into the passenger seat. At this point, Martinez was able to slide over to the driver seat, lock defendant out of the car, and escape.

On this factual record, the trial court had sufficient grounds for declining to apply section 654 to preclude a separate sentence on count three. We accept as reasonable the prosecution's argument that, while defendant may have had a common intent when committing the robbery and attempted carjacking against Martinez (to wit, the intent to steal), his intent when falsely imprisoning her appears different and new. At that point, defendant had already taken Martinez's car keys and phone, and had confirmed she had no money to give him. Moreover, Martinez had told defendant he could take her car but that she did not want to get into the car with him. Nonetheless, defendant placed the knife about an inch from her stomach and instructed her to get in. What would have transpired had Martinez not been able to escape at that point is not known. However, the fact remains that substantial evidence exists in support of the trial court's finding that

17

defendant, when he continued to force Martinez into the car at knife point, despite her insistence that he take her car and leave, harbored a separate intent. As such, the court's decision to impose a sentence for count three was appropriate. (See *People v. Saffle* (1992) 4 Cal.App.4th 434, 438 [substantial evidence supported the trial court's finding that the defendant had separate objectives when committing sex crimes and a false imprisonment crime where the "false imprisonment followed the completion of the sexual acts and was to prevent [the defendant's] detection as the attacker"].)

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

*People v. Bernardo Sanchez Zapata*, A139209

18