Filed 3/30/22  P. v. Johnson CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEFFREY ARDONAL JOHNSON,<br><br>    Defendant and Appellant. | B309104<br><br>Los Angeles County<br> Super. Ct. No. VA146860 |

APPEAL from a judgement of the Superior Court of Los Angeles County.  Olivia Rosales, Judge.  Conditionally reversed.

Berangere Allen-Blaine, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

—————————

A jury convicted Jeffrey Ardonal Johnson of first degree murder.  On appeal, he argues the trial court erred in denying his *Batson/Wheeler* motion.[1]  He also contends he was entitled to a new trial because the jury foreperson committed misconduct by providing the other jurors with an erroneous definition of intent.  Alternatively, he argues the court should have granted his motion to disclose juror information so he could obtain admissible evidence of misconduct by the foreperson.  We agree with Johnson that the court abused its discretion by denying his motion to disclose juror information.  Accordingly, we conditionally reverse the judgment pending further proceedings on the issue.  We affirm the judgment in all other respects.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. ***The prosecution's case***

The People filed an information charging Johnson with the murder of Maurice Elston (Pen. Code, § 187, subd. (a)).[2]  The People further alleged that Johnson used a deadly and dangerous weapon during the commission of the offense (§ 12022, subd. (b)(1)).

At trial, the People presented evidence showing Johnson's son, Jeffrey Johnson Jr., was in a relationship with Elston's sister, Aubrianna Elston.[3]  Jeffrey Jr. and Aubrianna had two children together.

---

[1]      *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2]      Undesignated statutory references are to the Penal Code.

[3]      We refer to some of the witnesses by their first names for the sake of clarity.  We mean no disrespect.

Sometime in 2014, Aubrianna was living with Johnson and his family. Aubrianna had a fight with Jeffrey Jr. and decided to move out of Johnson's home. Elston went to get Aubrianna's belongings and had a verbal argument with Johnson and his family members.

On January 27, 2018, Aubrianna's family members, including Elston, helped her move into the same apartment complex where Johnson lived with his family. Johnson knocked on Aubrianna's door, and Elston answered. Johnson asked to speak with Aubrianna, but Elston claimed she was busy and Johnson could talk to him. Johnson appeared to be enraged and left.

Some time later, Aubrianna and her family members started walking to the apartment's parking garage. Jeffrey Jr. appeared and grabbed his son from Aubrianna's aunt. Aubrianna and her family members followed Jeffrey Jr. into the garage, where Johnson and his family members were waiting. Aubrianna and Jeffrey Jr. started hitting each other, and a fight broke out among the other family members.

Jeffrey Jr. started fighting Elston, and Johnson joined his son. At some point, Elston said, "You stabbed me," and Jeffrey Jr. responded, "That's what the fuck you get." Johnson picked up a knife off the ground, got in his car, and drove away. Elston suffered a six-inch knife wound to his abdomen, which was fatal.

About an hour or two after the fight, Johnson returned to the apartment building and the police detained him. Johnson told one of the officers he acted in self-defense and the knife was in his apartment. The police found a knife in the kitchen sink, but there was no blood on it.

During an interview with detectives the next day, Johnson said he went to Aubrianna's apartment to tell her to call Jeffrey Jr. Elston answered the door and said she was busy. Johnson thought Elston was trying to intimidate him. Johnson went back to his apartment to relax, but he was paranoid that Elston might come to his door. He grabbed a kitchen knife and put it into his back pocket.

Some time later, Johnson went to the parking garage to help his daughters get their belongings and children out of a car. Jeffrey Jr. walked into the garage holding his baby, and Aubrianna and her family members followed him. Aubrianna and her family members tried to take the baby from Jeffrey Jr., and Johnson's daughters moved in to "break it up." Elston grabbed one of Johnson's daughters and slammed her against a gate.

Johnson hugged Elston from behind and tried to pull him off his daughter. Elston, who was bigger and stronger than Johnson, grabbed him by his shirt collar and started to "chok[e]" him. Johnson was scared and stabbed Elston one time. He did not try to stab deep—only enough to get Elston off him. Elston then threw Johnson to the ground.

Johnson walked back to his apartment, and on the way he realized Elston was Aubrianna's brother. Johnson washed the knife and threw it in the kitchen sink. He drove off in his car so he could think.

A detective who interviewed Johnson did not see any indication on his body that he had been choked. Nor did the detective see any injuries on Johnson's hands.

## 2. *The defense's case*

Johnson presented evidence that Elston acted aggressively and tried to force his way into Johnson's home during their encounter in 2014. He also presented evidence that Elston attacked his daughter, Latrina Sibley, in the parking garage. Johnson pulled Elston off Sibley. Aubrianna's mother then attacked Sibley and punched Johnson's other daughter in the head.

## 3. *Deliberations, verdict, and sentencing*

While deliberating, the jury requested the court provide the legal definitions of intent, first degree murder, and second degree murder. The jury also requested copies of the PowerPoint presentations the parties used during closing arguments. The court directed the jury to its prior instructions on murder and refused its request for the PowerPoint presentations.

The jury found Johnson guilty of first degree murder and found true the weapon allegation. The court sentenced him to 25 years to life for the murder plus one year for the weapon enhancement.

Johnson timely appealed.

## DISCUSSION

## 1. *Johnson's* Batson/Wheeler *motion*

### a. *Voir dire*

In response to questioning by Judge John Torribio during voir dire, Juror No. 6571 revealed his brother and cousin had been prosecuted for killing the juror's aunt. The juror did not believe his brother and cousin, who were juveniles at the time, were treated fairly by the system. He explained that the police refused their request to have a lawyer and family member be present with them. His brother was sentenced to 25 years to life.

5

The juror said that, despite his feelings about the system's treatment of his family members, he could be fair in this trial.

At some point during voir dire, Judge Olivia Rosales took over for Judge Torribio because he felt ill. In front of Judge Rosales, Juror No. 6571 answered the court's standard questions as follows: "I live in South Gate. I am a service associate at Walmart. I am single. And I have no experience on a jury."

The prosecutor later used her second peremptory challenge to request the court excuse Juror No. 6571. Defense counsel then made a *Batson/Wheeler* motion on the basis that the juror was "one of two black males that we've got in the entire venire." The court said the juror appeared to be Latino, and the prosecutor agreed. Defense counsel responded that she and Johnson believed he was African American and there were no "grounds for his excusal. He works at Walmart. He is in service, works in the service department at Walmart. From South Gate. That's really all he has gone into."

The court found Johnson had not made a prima facie case that the prosecutor used her peremptory challenge based on the juror's race. The court then allowed the prosecutor to make a record. The prosecutor said she used her peremptory challenge because of the juror's statements regarding his family members' experiences with law enforcement. The court excused the juror without commenting on the prosecutor's reasons.

After the jury reached its verdict, Johnson filed a motion for new trial on the basis that the court erred by finding he did not make a prima facie case under *Batson/Wheeler*. He again argued that he is a Black man and the excused juror was one of two Black men in the venire. He also pointed out that the only other facts known to the court when it decided the initial motion

6

were that the juror worked at Walmart, was single, and lived in South Gate. He argued the prosecutor's stated reasons for excusing the juror could not have factored into the court's decision because they were elicited while Judge Torribio was presiding over the trial.

At the hearing on the motion, the court said it still believed the juror was Latino, but acknowledged it was possible he was "Afro-Latino" and "partially black." The court noted, however, that it was the prosecutor's perception that mattered. The court then said the prosecutor "stated her non-discriminatory basis for exercising that peremptory. And given the total . . . record and the relevant facts, I do not find . . . any evidence that the peremptory was exercised on a discriminatory basis. So the court does not find error in that . . . and did not find a prima facie case."

b. *Johnson did not make a prima facie case of discrimination*

Johnson contends the trial court erroneously denied his *Batson/Wheeler* motion.

In *Wheeler, supra*, 22 Cal.3d 258, the California Supreme Court " 'held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116.) Eight years later in *Batson, supra*, 476 U.S. 79, " 'the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws

7

under the Fourteenth Amendment to the United States Constitution.' " (*Catlin*, at p. 116.)

When a party makes a *Batson / Wheeler* motion, the trial court and counsel must follow a three-step process. " 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " (*People v. Avila* (2006) 38 Cal.4th 491, 541, citing *Johnson v. California* (2005) 545 U.S. 162, 168.)

" ' "[W]hen a trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.] If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm. [Citation.]" ' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 116–117; see *People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*).)

Johnson contends the trial court erred in finding he failed to make a prima facie case of discrimination. The entire basis for his challenge is that he is a Black man, and the prosecutor used a peremptory challenge to excuse one of only two Black men

8

in the venire.  Such circumstances alone, however, do not give rise to an inference of discriminatory intent.  In *People v. Parker* (2017) 2 Cal.5th 1184, for example, an African-American defendant made a *Batson/Wheeler* motion based on the fact that the prosecutor struck the only two African-Americans from the jury pool.  (*Id*. at pp. 1206, 1212.)  In affirming the trial court's denial of the motion, the Supreme Court explained that, although the exclusion of a single prospective juror could be the product of an improper group bias, " ' "[t]he small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible." ' " (*Id*. at pp. 1212–1213.)  Here, there is even less of a basis for an inference of discrimination given the prosecutor struck fewer than all the Black prospective jurors.

The record also reveals a compelling race-neutral reason to excuse Juror No. 6571.  (See *Scott, supra*, 61 Cal.4th at p. 385 [when deciding whether a prima facie case of discrimination exists, a reviewing court may consider race-neutral reasons for a peremptory challenge that are apparent from and clearly established in the record].)  In response to Judge Torribio's questions, the juror said he believed his brother and cousin were mistreated by law enforcement after being charged with killing his aunt.  Our Supreme Court has "recognized a relative's negative experiences with law enforcement as a race-neutral hypothetical reason for a strike that dispels any inference of discriminatory intent." (*People v. Reed* (2018) 4 Cal.5th 989, 1001; see *People v. Booker* (2011) 51 Cal.4th 141, 167, fn. 13 ["A negative experience with the criminal justice system is a valid neutral reason for a peremptory challenge."].)

Johnson seems to suggest we may not consider the juror's responses to Judge Torribio's questions because they were not

known to Judge Rosales when she denied his original motion. Johnson overlooks that Judge Rosales was aware of the responses when she considered and rejected his motion for new trial. In any event, on review, we must consider the entire record of voir dire at the point when Johnson made his challenge, which includes the juror's responses to Judge Torribio's questions. On this record, Johnson has not established a prima facie case of discrimination.[4]

## 2. *Johnson's juror misconduct motions*

### a. *Post-verdict proceedings*

After trial, Johnson filed a motion to unseal identifying information of the empaneled jurors. Johnson argued the information was necessary so he could obtain evidence favorable to him in a motion for new trial.

Johnson attached to the motion a declaration from his counsel that recounted her conversation with the jury foreperson after trial. According to counsel's declaration, the foreperson said the jurors were split, nine to three, on whether Johnson intended to kill Elston. The foreperson "then explained that she had some training and experience in the law, and . . . she advised the three hold-outs that 'intent' had a different meaning under the law

---

[4] For the first time in his reply brief, Johnson argues the trial court improperly based its prima facie ruling on its belief, shared by the prosecutor, that the juror was Latino. According to Johnson, the court's reasoning was faulty because being Latino and Black are not mutually exclusive. Johnson forfeited the issue by failing to raise it in his opening brief. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218 [a defendant forfeited an argument initially raised for the first time in the reply brief].) Accordingly, we decline to consider it.

10

than it does in 'real life.' She said she provided the hold-outs with the following analogy: if a person leaves their purse in the middle of the room but does not intend to cause someone to trip on it, they may not have intent to cause someone to trip in real life, but under the law they do because they should not have left their purse in the middle of the room. After providing this analogy, the three hold-outs changed their votes to guilty."

Defense counsel said she asked the foreperson for her contact information so an investigator could talk to her. The prosecutor, who was present during the conversation, objected and said it was not appropriate for an investigator to interview the foreperson. The foreperson responded that she did not want to get "in the middle of things" and declined to speak further.

The prosecutor opposed Johnson's motion on the basis that he failed to establish a prima facie case of good cause for the release of juror information. The prosecutor included in the opposition brief her recollection of the conversation with the foreperson. According to the prosecutor, the "foreperson stated that the issue of intent came up when [the jurors] were deciding between first and second-degree murder. . . . [T]he foreperson did not tell the defense and the prosecution that there were 3 hold-outs for Not Guilty. . . . The foreperson did discuss an example being brought forth during deliberations to explain intent but it did not evince any issues of misconduct. In none of her statements to counsel did it appear that any of the jurors engaged in any misconduct. It appeared to the People from this brief discussion with the foreperson that all the jurors deliberated thoughtfully."

The court denied Johnson's motion after finding defense counsel's declaration did not show "misconduct that would rise

11

to the level of good cause for disclosing" the jurors' information. The court noted the foreperson's comments were "something that jurors may do in [the jury room], but it doesn't mean that the rest of [the jurors] followed . . . ." The court also noted the jurors requested the definitions of intent and murder, they returned their verdict shortly after receiving the court's response, there is no evidence the jurors were confused by the court's instructions, and there is a presumption that the jurors followed those instructions.

After the court denied Johnson's motion to unseal juror information, he moved for a new trial based on juror misconduct. Johnson argued the foreperson committed misconduct when she "drew on her prior legal training to provide the jurors with an inaccurate definition of intent that likened specific intent to negligence." Johnson alternatively asked the court to reconsider his motion to unseal juror information so he could interview the jurors regarding the extent of the misconduct.

The prosecutor urged the court to reject Johnson's motion because it was supported only by his counsel's statements, which are hearsay. In passing, the prosecutor also argued there was no prejudice.

The court concluded Johnson failed to show juror misconduct and denied his motion on that basis. The court explained that, even if it accepted defense counsel's recounting of the conversation with the foreperson, there is no evidence showing when the foreperson made her comments, whether the other jurors listened to her, whether they were swayed by her comments, or whether they based their verdict on her statements. The court also noted the jurors reached their verdict shortly after it directed them to the relevant jury instructions on

12

murder and intent.  The court did not decide whether Johnson's evidence was admissible; nor did it explicitly consider whether any misconduct was prejudicial.

        b.      *Johnson did not submit admissible evidence of juror misconduct in connection with his motion for new trial*

Johnson suggests the trial court should have granted his motion for new trial because the jury foreperson engaged in prejudicial misconduct.

" 'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible.  (See Evid. Code, § 1150, subd. (a).) If the evidence is admissible, the court must then consider whether the facts establish misconduct.  [Citation.]  Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial.  [Citations.]  A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion.' " (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467 (*Bryant*).)

The Attorney General does not defend the trial court's stated reasons for denying Johnson's motion, and for good reason. To the extent the factors the court cited were relevant, they went to the issue of prejudice.  The court, however, never explicitly reached that issue.  Instead, it concluded defense counsel's declaration did not describe juror misconduct.  As we discuss in the next section, that finding was erroneous.

Moreover, even if the trial court implicitly found there was no prejudice, its remarks at the hearing suggest it based that decision on improper factors.  The court noted, for example,

13

the lack of evidence showing the jurors were swayed by the foreperson's comments or relied on them in reaching their verdict.  Johnson, however, was not permitted to submit evidence of the jurors' internal thought processes.  (See Evid. Code, § 1150; *In re Manriquez* (2018) 5 Cal.5th 785, 799 [" 'Evidence of a juror's mental process—how the juror reached a particular verdict, the effect of evidence or argument on the juror's decisionmaking— is inadmissible.' "].)  The court, therefore, erred to the extent it denied Johnson's motion based on the lack of such evidence.

Nevertheless, the Attorney General urges us to affirm because Johnson failed to support his motion with sworn affidavits from the jurors.  Although the court did not deny Johnson's motion for this reason, we may affirm on any correct basis presented by the record.  (*People v. Perkins* (2016) 244 Cal.App.4th 129, 139.)

"It is settled . . . that 'a jury verdict may not be impeached by hearsay affidavits.' " (*People v. Williams* (1988) 45 Cal.3d 1268, 1318, abrogated on other grounds as noted in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)  As a result, "California courts have consistently held that properly executed juror affidavits are required to establish jury misconduct." (*Bryant, supra*, 191 Cal.App.4th at p. 1468.)  Here, Johnson did not submit any juror affidavits in support of his motion for new trial.  Instead, he relied entirely on his counsel's declaration recounting her conversation with the foreperson, which is inadmissible hearsay to the extent it was used to show what occurred in the jury room.  Johnson, therefore, failed to meet his burden of producing admissible evidence of misconduct, and the court properly denied his motion for new trial.

14

c.    *Johnson showed good cause to unseal juror information*

Johnson alternatively argues the trial court abused its discretion by denying his motion to unseal juror information.[5] He insists the information was necessary so he could obtain admissible evidence to support his motion for new trial.

After the recording of a jury's verdict in a criminal trial, the court must seal "personal juror identifying information" such as jurors' names, addresses, and telephone numbers. (Code Civ. Proc., § 237, subd. (a)(2); *People v. Munoz* (2019) 31 Cal.App.5th 143, 165.)  A defendant may petition the court for access to the juror information by making a " 'prima facie showing of good cause for [its] release.' " (*Munoz*, at p. 165.) "If the trial court finds that the moving party has made a prima facie showing of good cause, and if it finds no compelling interest against disclosure, it must set the matter for hearing.  (Code Civ. Proc., § 237, subd. (b).)  The trial jurors are entitled to notice, an opportunity to object to disclosure, and an opportunity to appear [at the hearing].  (Code Civ. Proc., § 237, subd. (c).) [¶] If none of the jurors object, the trial court must grant disclosure.  However, if a juror is unwilling to be contacted, the trial court must deny

---

[5]    The Attorney General contends Johnson forfeited this issue because he raised it in two, cursory paragraphs under a subheading related to juror misconduct.  (See *People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised."]; Cal. Rules of Court, rule 8.204(a)(1)(B) [appellate briefs must state each point under a separate heading or subheading].)  While we agree that Johnson's briefing is far from ideal, we exercise our discretion to consider the issue on the merits.

disclosure.  (Code Civ. Proc., § 237, subd. (d).)" (*People v. Johnson* (2013) 222 Cal.App.4th 486, 492 (*Johnson*).)  We review a trial court's denial of a motion to disclose juror information for an abuse of discretion.  (*Ibid*.)

A defendant establishes good cause for the disclosure of juror information by showing "that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*Johnson, supra*, 222 Cal.App.4th at p. 493.)  A juror commits misconduct by introducing into the jury room extraneous law; that is, law not given to the jury by the court. (See *In re Stankewitz* (1985) 40 Cal.3d 391, 397 (*Stankewitz*); *People v. Marshall* (1990) 50 Cal.3d 907, 950 (*Marshall*).) In *Stankewitz,* for example, our Supreme Court held a juror committed overt misconduct by erroneously advising the other jurors he knew, based on his experience as a police officer, a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it.  (*Stankewitz*, at pp. 396, 399–400.)  Similarly, in *Marshall,* the high court held a juror committed misconduct by telling other jurors he knew, based on his background in law enforcement, juvenile records are automatically sealed at 18 years of age. (*Marshall*, at pp. 949–950.)

Here, Johnson supported his motion with a declaration from defense counsel that revealed similar misconduct by the jury foreperson.  According to counsel's declaration, the foreperson essentially advised the other jurors they only had to find Johnson acted negligently to conclude he had the intent to kill.  The foreperson also vouched for her erroneous advisement by disclosing that she had prior legal training and experience.  Assuming defense counsel accurately recounted

16

the conversation, and what the foreperson told her is true, the foreperson committed overt misconduct by introducing extraneous and erroneous law into the jury room. (See *Marshall, supra*, 50 Cal.3d at pp. 949–950; *Stankewitz, supra*, 40 Cal.3d at pp. 397, 399–400.)

In light of defense counsel's declaration, it is reasonably likely Johnson could obtain admissible evidence of misconduct if he were to interview the jurors. Johnson, therefore, made a prima facie showing of good cause for the release of juror information, and the court abused its discretion by failing to conduct a hearing under Code of Civil Procedure section 237, subdivision (c).[6]

The Attorney General suggests defense counsel's declaration is insufficient to establish good cause because it is hearsay. A defendant, however, is not required to introduce admissible evidence of juror misconduct in order to establish good cause for the disclosure of juror information. (*Johnson, supra*, 222 Cal.App.4th at p. 493.) In *Johnson*, for example, the court held a defendant established good cause by submitting a declaration from his stepfather recounting a conversation with jurors in which they revealed misconduct during deliberations. (*Id*. at pp. 490–491.) In rejecting the argument that the declaration was inadmissible hearsay, the court explained

---

[6] The court held a hearing on Johnson's motion, but there is nothing in the record indicating it provided notice to the jurors and an opportunity to object to the release of their information, as required under Code of Civil Procedure section 237, subdivision (c). Instead, the court only considered whether Johnson made a prima facie showing of good cause for the release of juror information.

17

that "[t]he whole point of moving for the disclosure of jurors' identifying information is to talk to the jurors; and the whole point of talking to the jurors is to obtain evidence of juror misconduct that will support a motion for new trial. The only people who can testify of their own personal knowledge about what happened in the jury room are the jurors themselves. Thus, it would be absurd to require a defendant seeking disclosure to introduce, at that preliminary stage, admissible evidence that juror misconduct actually occurred." (*Id*. at p. 493.) We agree.

The Attorney General alternatively argues Johnson failed to show good cause because defense counsel and the prosecutor gave differing accounts of their conversation with the foreperson. According to the Attorney General, the trial court could have credited the prosecutor's version of events and found there was no misconduct. Under Code of Civil Procedure section 237, however, the defendant is required only to make a prima facie showing of good cause before the court must set a hearing.[7] (Code Civ. Proc., § 237, subd. (b).) The court does not weigh evidence or make credibility determinations when deciding that issue. (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1164; see *People v. Harris* (2021) 60 Cal.App.5th 939, 958 ["in evaluating whether a petitioner has made a prima facie showing he or she is entitled to relief[ ]the superior court cannot engage in factfinding"].) The trial court, therefore, could not rely on

---

[7] The court need not set a hearing if it finds there is a compelling interest against disclosure. (Code Civ. Proc., § 237, subd. (b).) The Attorney General does not contend such a compelling interest exists here, nor have we found any indication of one in the record.

18

the prosecutor's version of events to find Johnson failed to show good cause.

Regardless, the prosecutor's version of events did not refute the factual assertions in defense counsel's declaration. The prosecutor, in fact, acknowledged the foreperson said she discussed an "example . . . during deliberations to explain intent." Rather than describe the example, the prosecutor simply claimed it "did not evince any issues of misconduct.  In none of [the foreperson's] statements to counsel did it appear that any of the jurors engaged in any misconduct."  Such conclusory statements are not sufficient to rebut Johnson's showing.

We also reject the Attorney General's contention that the disclosure of juror information would be futile given the foreperson already indicated she did not want to speak with a defense investigator.  According to defense counsel, the foreperson declined to speak with an investigator only after the prosecutor told her it would be inappropriate to do so. There is nothing inherently improper about a juror talking to a defense investigator, and the prosecutor should not have made that remark.  There is a reasonable possibility the foreperson would change her mind if properly instructed by the court.

In any event, the Attorney General overlooks that Johnson sought information for all the empaneled jurors, not just the foreperson.  The other jurors have personal knowledge of what the foreperson said in the jury room.  Therefore, even if the foreperson declines to be interviewed, it is reasonably likely Johnson could obtain admissible evidence of misconduct from those jurors.

19

### 3.     *We reject Johnson's cumulative error contention*

Johnson argues the cumulative effect of the *Batson/Wheeler* error and juror misconduct deprived him of a fair trial and requires reversal of his conviction.  As discussed above, Johnson has not shown *Batson/Wheeler* error or juror misconduct.  Accordingly, we reject his argument that cumulative error requires reversal.

### DISPOSITION

The judgment is conditionally reversed.  On remand, the court shall set a hearing in accordance with Code of Civil Procedure section 237 to consider whether to disclose juror information.  If, after the hearing, the court declines to do so, it shall reimpose the original sentence.  If the court instead discloses juror information, it shall provide Johnson a reasonable amount of time to file a motion for new trial.  If Johnson does not timely file a motion for new trial, or if the court denies his motion, the court shall reimpose the original sentence.  The judgment is affirmed in all other respects.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.


We concur:



EDMON, P.J.                                    LAVIN, J.


20